IN THE COMMONWEALTH COURT OF PENNSYLVANIA

J&S Technology Solutions, Inc., : CASES CONSOLIDATED
                     Petitioner :
                      :
          v. : No. 922 C.D. 2023
                      :
Wilben Gonzalez, Dish Network, :
LLC, Brickstreet Insurance Company, :
and Uninsured Employer Guaranty :
Fund (Workers' Compensation :
Appeal Board), :
                Respondents :

Dish Network, LLC, :
                     Petitioner :
                      :
          v. : No. 928 C.D. 2023
                      : Argued: February 4, 2026
Wilben Gonzalez, J&S Technology :
Solutions, Inc., Brickstreet Insurance :
Company, and Uninsured Employer :
Guaranty Fund (Workers' Compensation :
Appeal Board), :
                Respondents :

BEFORE: HONORABLE RENÉE COHN JUBELIRER, President Judge
          HONORABLE PATRICIA A. McCULLOUGH, Judge
          HONORABLE ANNE E. COVEY, Judge
          HONORABLE CHRISTINE FIZZANO CANNON, Judge
          HONORABLE STACY WALLACE, Judge
          HONORABLE MATTHEW S. WOLF, Judge
          HONORABLE STELLA M. TSAI, Judge

OPINION BY
PRESIDENT JUDGE COHN JUBELIRER       FILED: August 4, 2026

In these consolidated appeals,[1] J&S Technology Solutions, Inc. (J&S) and Dish Network, LLC (Dish Network), petition for review from the Order of the Workers' Compensation Appeal Board (Board) that affirmed the decision of a Workers' Compensation Judge (WCJ), concluding that Wilben Gonzalez (Claimant) was an employee of J&S and that Dish Network was Claimant's statutory employer under Section 302(a) of the Workers' Compensation Act (Act).[2] In doing so, the WCJ found Dish Network did not justifiably rely on documentation from Brickstreet Insurance Company (Brickstreet) that J&S carried workers' compensation (WC) insurance. On appeal, J&S argues that the Board erred in concluding that Claimant established that J&S was his employer under the legal standards set forth in, among other cases, *Universal Am-Can Ltd. v. Workers' Compensation Appeal Board (Minteer)*, 762 A.2d 328, 333 (Pa. 2000), and *American Road Lines v. Workers' Compensation Appeal Board (Royal)*, 39 A.3d 603, 611 (Pa. Cmwlth. 2012), where the evidence points to Claimant being an independent contractor. Dish Network asserts that it did all it could do to ascertain J&S's insurance status, and the WCJ and Board erred in not finding that Brickstreet was estopped from denying coverage based on the representations of its authorized agent that J&S was insured by Brickstreet at the time of Claimant's injury.

---

[1] This Court consolidated the appeals of J&S Technology Solutions, Inc. (J&S) and Dish Network, LLC with J&S as the designated petitioner under Pa.R.A.P. 2136, by Order dated October 20, 2023.

[2] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. § 461. It states, in relevant part:

A contractor who subcontracts all or any part of a contract and his insurer shall be liable for the payment of compensation to the employes of the subcontractor unless the subcontractor primarily liable for the payment of such compensation has secured its payment as provided for in this act.

*Id.*

## I. BACKGROUND

### A. WCJ Proceedings

On April 2, 2020, Claimant filed a claim petition naming J&S as his employer and alleging that on October 28, 2019, he sustained serious work-related injuries when he fell from a ladder while installing a satellite dish for a customer of Dish Network, who contracted with J&S to install its satellite dishes. Claimant sought temporary total disability benefits for his inability to work due to the work injuries. J&S, in turn, filed a petition to join Brickstreet Insurance Company (Brickstreet), its WC insurer, on June 8, 2020. Claimant thereafter filed a claim petition against the Uninsured Employer Guaranty Fund (Guaranty Fund), which petitioned to join Dish Network as another employer. The WCJ held multiple hearings,[3] at which numerous witnesses testified and documentary evidence was introduced.

Claimant testified at two hearings,[4] describing, relevantly, his relationship with J&S and his work duties, as follows. J&S hired Claimant in July 2015 on a part-time basis to install satellite dishes and related equipment for different internet and phone companies, including HughesNet. Claimant signed an Independent Contractor Agreement (IC Agreement), which J&S introduced into evidence,[5] when he was initially hired, but this agreement expired in June 2016. He was not presented with another IC Agreement to sign. Claimant later began working for J&S full-time, after which he could not refuse jobs, and was told by J&S's owner that he could not work for anyone else. Claimant was never required to show proof he had WC

---

[3] The WCJ held the hearings via video conference and telephone, consistent with the regulation at 34 Pa. Code § 131.54(a) ("At the discretion of the judge, the hearings may be conducted by telephone or other electronic means **if the parties do not object**.") (emphasis added). None of the parties objected.

[4] Claimant's testimony is found at pages 11a to 110a of J&S's Reproduced Record and pages 90 to 98 of Certified Record Item 32 and summarized in the WCJ's Finding of Fact 3.

[5] The IC Agreement is found at pages 332a to 340a of J&S's Reproduced Record.

insurance and never did so while working for J&S. In July 2019, J&S told Claimant that HughesNet discontinued his tech number and that Claimant was being laid off.

He was rehired in August 2019 to work for J&S as a technician installing and repairing Dish Network satellite dishes and associated equipment. Prior to being issued a tech number for Dish Network, Claimant underwent an extensive background check by J&S. Because more training was needed for Dish Network jobs, J&S's route manager Shawn Waltz trained Claimant on how to install and repair Dish Network satellite dishes. Claimant's work duties included loading equipment in vans, using a drill, climbing, walking, crawling, and carrying objects that weighed up to 50 pounds. Claimant used his own drill, hammer, screwdriver, wrench and sockets, and safety glasses, but could purchase them from J&S if needed. J&S provided the major equipment needed to install the satellite dishes, including cable, meters, concrete, and the dishes themselves. Claimant wore a uniform provided to him by J&S that had both J&S and Dish Network logos on it. J&S paid Claimant by the job and issued him a 1099. Claimant used his own van, paying for his own tolls, gas, maintenance, and insurance, but J&S paid him more per job to cover those costs. Claimant put a Dish Network magnet supplied by J&S on his van. Claimant purchased a commercial liability insurance policy while working for a previous installation company, which he maintained for several years including on October 28, 2019, the date he was injured.

Claimant received his daily job and route assignments via a J&S and Dish Network encrypted application that tracked where Claimant was throughout the day. Claimant testified that if he finished a job early, a new assignment would be given through the application. He averaged about three to five jobs, and up to seven jobs, a day. Claimant did not and could not refuse any jobs, and he was prohibited by

4

J&S from working for any competing satellite installers and from using a helper or outsourcing an installation to another person. J&S had the right to fire Claimant if it did not like his work. Claimant had no discretion to direct the manner in which he installed satellites, and if there was a customer issue, it was between the customer, his supervisor, and Dish Network as to the placement of a satellite dish.[6] (J&S's Reproduced Record (J&S's R.R.) at 28a-29a.)

J&S's president, John Lumbard, Jr., testified as follows.[7] J&S is a retailer for Dish Network and HughesNet, and its regular business is the sale, installation, and repair of television and internet satellite dishes. J&S has installers who are employees and installers who work as independent contractors; both are expected to meet the same work standards. Claimant was an independent contractor, and the relationship between J&S and Claimant did not change after the IC Agreement expired even though that agreement did not contain a renewal clause. Claimant was allowed to work for other companies. While the IC Agreement required independent contractors to have WC insurance, J&S never required Claimant to provide proof of such insurance, but J&S did require a certificate of liability insurance.[8] Mr. Lumbard could not lay off Claimant in July 2019 because Claimant was an independent contractor. When Claimant returned to J&S in August 2019, he performed only installations and repairs for Dish Network, he did not have a Dish Network tech

---

[6] Claimant also presented the deposition testimony and related materials of his medical expert, Jed Shapiro, MD/DO, which is found at Certified Record Items 35 to 37 and summarized in Finding of Fact 13. J&S submitted two Independent Medical Examination reports, found at Certified Record Items 47 and 50 and summarized in Findings of Fact 14 and 15. Because the issues involved in this appeal are related solely to his employment status, we do not address Claimant's diagnoses and medical treatment.

[7] Mr. Lumbard's testimony is found at pages 133a to 189a and pages 210a to 280a of J&S's Reproduced Record and summarized in Finding of Fact 8.

[8] J&S introduced several certificates of liability insurance naming Claimant as the insured. (J&S's R.R. at 346a-50a.)

number when he returned, J&S trained Claimant on how to install Dish Network's satellites, and Claimant could not bring a helper or an employee without approval. Mr. Lumbard disputed that Claimant received additional pay for using his own vehicle, but he acknowledged that Claimant wore a uniform with J&S and Dish Network logos on it. Claimant had the ability to reject jobs and had done so, but Mr. Lumbard acknowledged that if Claimant repeatedly accepted jobs in the morning and rejected jobs in the afternoon he would no longer be working for J&S. The satellites Claimant would install were provided by J&S on consignment, and Claimant had to purchase certain items, like cable and flex clips, from J&S or another Dish Network-approved vendor. Dish Network gives a four-hour window for installations to occur, and installers like Claimant had the discretion as to when in that window they will arrive and complete the work. Dish Network placed a value on each job and when the job is closed, Dish Network paid J&S, which then paid Claimant approximately 60% of the job's value.

As for J&S's WC insurance coverage, Mr. Lumbard testified to the following. John Hiney is J&S's insurance agent, and J&S had a WC insurance policy through Brickstreet for the period of September 25, 2018, to September 25, 2019. J&S was reminded by Dish Network prior to September 25, 2019, that J&S's WC coverage would expire on that date and needed to be renewed. Mr. Lumbard requested Mr. Hiney to issue a certificate of insurance (Certificate) certifying WC coverage for the next policy year and, upon receipt, forwarded that certificate to Dish Network. J&S did not receive a bill or invoice for a premium from Brickstreet for the new policy period.

Shawn Waltz, a field operations manager for J&S, testified[9] as follows. Claimant was a contractor for J&S, and he did not train Claimant but allowed Claimant to shadow him for a couple of days during which Claimant learned how to complete the tasks needed to install Dish Network equipment. J&S employees and contractors receive their jobs in the same way, but contractors can pick what jobs they will complete. Claimant could not hire a subcontractor or assign his jobs to someone else even if they were authorized by Dish Network to perform installations. Claimant was generally available every day unless he advised J&S he was not, and Claimant refused jobs on occasions, but he was still assigned work after doing so. However, if a contractor stops doing what they are told, that contractor would stop receiving work eventually. During the installation appointment windows, the contractor can show up and leave at any time, and Mr. Waltz indicated the contractor does not have to complete the work. Mr. Waltz is the primary contact if there are any disputes or issues with installation with a customer or landlord.

The WCJ then found, based on the Installation Service Provider Agreement (ISP Agreement) introduced into evidence, that the relationship between J&S and Dish Network is governed by that agreement,[10] in paragraph 12 of which J&S agreed to obtain and maintain WC coverage through the term of the ISP Agreement at J&S's own cost and expense. (WCJ Finding of Fact (FOF) ¶ 4.) Paragraph nine of the ISP Agreement requires that J&S indemnify Dish Network if J&S fails to comply with any provision of that agreement. (*Id.* ¶ 5.) The ISP Agreement sets forth Dish Network's performance standards for the installation of its products, and Dish Network can assign and pull work from J&S. (*Id.* ¶ 8c.)

---

[9] Mr. Waltz's testimony is found at pages 283a to 330a of J&S's Reproduced Record and summarized in Finding of Fact 11.

[10] The ISP Agreement is found at pages 17a to 62a of Dish Network's Reproduced Record.

Mr. Hiney, a licensed insurance agent and employee of the Davis Insurance Agency, J&S's insurance agency, testified as follows.[11] As an independent agent, he can sell insurance coverage with any insurer he works with so long as the coverage meets the underwriting guidelines. Brickstreet is one of the insurance companies Mr. Hiney works with, and he has the authority to solicit and place policies for Brickstreet. Mr. Hiney's role is to help policyholders choose the right coverage for the price and acts as the policyholder's agent when pricing and placing coverage. Mr. Hiney placed a WC policy, policy #WCS3001328, through Brickstreet for J&S for the period of September 25, 2018, to September 25, 2019, which expired at 12:01 a.m. on September 25, 2019. Mr. Hiney worked with Mr. Lumbard in the summer and fall of 2019 to renew J&S's WC policy with Brickstreet, and on September 24, 2019, he issued the Certificate certifying that a WC policy was issued to J&S for September 25, 2019, to September 25, 2020. Dish Network was listed as the certificate holder. But no renewal policy was in effect when Mr. Hiney issued the Certificate on September 24, 2019, at which time Brickstreet had quoted a renewal price but was waiting for J&S to pay the premium. Mr. Hiney was unaware if Brickstreet sent J&S an invoice but **learned on October 25, 2019**, that Brickstreet was **not going to renew** the policy because J&S had not paid the premium, which Mr. Lumbard confirmed. Thus, when Claimant was injured on October 28, 2019, J&S had **no WC coverage in place**.

The Certificate Mr. Hiney issued stated:

> THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR

---

[11] Mr. Hiney's testimony is found at pages 63a to 95a of Dish Network's Reproduced Record and summarized in Finding of Fact 6.

ALTER THE COVERAGE AFFORDED BY [POLICY # WCS3001328]. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

(FOF ¶ 7 (bold emphasis omitted).)

Stephanie Trammel, a business operations analyst II for Dish Network's third-party management department, testified[12] about managing Dish Network's subcontractors to ensure they have proper insurance, including WC insurance, as required by Paragraph 12 of the ISP Agreement. Ms. Trammel uses a computer system that sends requests to providers to update their insurance policies at various intervals, and she had no reason to believe J&S did not receive the repeated requests for information about its expiring WC policy. Mr. Lumbard emailed Ms. Trammel on September 10, 2019, indicating that J&S's insurance agent knew that an updated certificate of insurance for its WC policy with new dates was needed, and J&S would forward the certificate when J&S received it. (FOF ¶ 10.) On September 25, 2019, Dish Network advised J&S that it was at risk of being deactivated as a provider if it did not provide a certificate of insurance that day. **J&S provided the Certificate** issued by Mr. Hiney that **certified WC coverage** from September 25, 2019, to September 25, 2020. Ms. Trammel reviewed the Certificate, found it to be in good order, and had no reason not to believe the Certificate. Due to the submission of the certificate, J&S remained an active installer. Neither Mr. Hiney nor Brickstreet notified Ms. Trammel or Dish Network that J&S's WC coverage had been cancelled, denied, or no longer existed after September 25, 2019, or that the certificate had been issued in error.

---

[12] Ms. Trammel's testimony is found at pages 96a to 122a of Dish Network's Reproduced Record and summarized in Finding of Fact 9.

9

Finally, Kelly Harmon, an assistant vice president of product management with Brickstreet, testified.[13] She is the liaison between Brickstreet's underwriting and Information Technology departments and ensures that Brickstreet's policy administration system that generates WC policies is synced with business needs. Mr. Hiney, an authorized agent for Brickstreet, communicated with Brickstreet using that electronic system in 2018 through 2020. J&S's WC policy was a "no touch policy," meaning that no underwriter needed to review the application and, so long as an authorized agent submitted the application through the electronic system and certain criteria were met, a quote would be immediately sent to the agent, who could accept the quote on behalf of the client. An email was sent to Mr. Hiney on July 21, 2019, indicating that a renewal quote was available to be viewed and acted upon. The next day, a quote proposal to activate J&S's renewal policy for the next year was sent to Mr. Hiney, and, although the notice contained J&S's address, Ms. Harmon was unaware if it was separately mailed to J&S. That quote remained open for 30 days after the expiration of the prior policy, or **until October 25, 2019**. If the quote was accepted after that date, Brickstreet required documentation that the insured did not have any accidents during the uninsured time. Brickstreet did not receive any acceptance of its renewal quote during the 30-day period. Brickstreet emailed Mr. Hiney on October 26, 2019, indicating that the renewal quote had not been accepted and updated J&S's status that renewal coverage had been rejected. J&S's prior WC policy expired; it was not cancelled.

Upon his review, the WCJ found the testimony of Claimant, Mr. Hiney, and Ms. Harmon credible based on their demeanor. (FOF ¶¶ 16-17, 21.) The WCJ found Ms. Trammel's testimony credible except to the extent she stated she inspected the

---

[13] Ms. Harmon's testimony is found at pages 42 to 66 of Certified Record Item 32 Reproduced Record and summarized in Finding of Fact 12.

Certificate, found it was in good order, and had no reason to disbelieve or reject the Certificate based on her demeanor and the disclaimer language in the Certificate. (*Id.* ¶¶ 7, 19.) The WCJ accepted the following testimony of Mr. Lumbard as credible:

(3) there was no renewal clause in the IC Agreement and [Mr. Lumbard] never had Claimant sign another IC Agreement;

(4) [from] August 2019[,] to October 28, 2019[,] Claimant was only doing Dish Network work[,] and Claimant did not have a Dish Network tech number when he returned in August 2019 to do such work;

(5) Claimant wore a uniform with the Dish Network and J&S [] logos at customers' premises;

(6) if Claimant repeatedly accepted jobs in the morning and declined to do the jobs in the afternoon, he would not be working for J&S [] much longer;

(7) [Mr. Lumbard] cannot point to an installation or cable job that Claimant accepted from an entity other than J&S [] between 2016 and October 28, 2019;

(8) Claimant could not bring a helper or another employee onto a Dish Network job without getting prior approval;

(9) [J&S's] insurance agent was [Mr.] Hiney;

(10) the initial [WC] policy with Brickstreet ran from September 25, 2018[,] to September 25, 2019;

(11) in the period leading up to September 25, 2019, [Mr. Lumbard] was notified by Dish Network that the [WC] policy was set to expire on September 25, 2019;

(12) [Mr. Lumbard] requested that Mr. Hiney provide him with a certificate of insurance certifying to [WC] coverage for the policy year September 25, 2019[,] to September 25, 2020; and

(13) [Mr. Lumbard] forwarded the [C]ertificate . . . on to Dish Network.

11

(FOF ¶ 18.) Beyond this, "Mr. Lumbard's testimony [was] explicitly rejected" based on Mr. Lumbard's demeanor. (*Id.* (emphasis omitted).)

The WCJ similarly "explicitly rejected" Mr. Waltz's testimony, based on his demeanor, except as to his testimony that:

> (2) Claimant acquired his knowledge about Dish Network processes through [Mr. Waltz];
>
> (3) [Mr. Waltz] is the primary contact when there is a dispute with a customer or landlord and a lot of times his phone number was provided when there was such a dispute;
>
> (4) if a "contractor" stops doing what he tells them to do, the "contractor" would eventually stop receiving work; and
>
> (5) Claimant had no discretion to hire a subcontractor or assign his Dish Network jobs to someone else – even if that person was Dish Network-authorized.

(FOF ¶ 20 (emphasis omitted).)

Based on the above determinations, the WCJ found that Claimant was an employee of J&S on October 28, 2019, the day he sustained disabling, work-related injuries from which he continued to suffer. (*Id.* ¶¶ 25-26; Conclusion of Law (COL) ¶ 2.) The WCJ also found that, on October 28, 2019, J&S did not have a WC policy in place that would cover Claimant's injury due to **J&S's failure to pay** the renewal premium for the Brickstreet policy, and Dish Network was a statutory employer under Section 302(a) of the Act. (FOF ¶¶ 9, 27-28; COL ¶¶ 3, 4a.) The WCJ further found that Mr. Hiney was acting on J&S's behest, not Brickstreet's, when he issued the Certificate on September 24, 2019. (FOF ¶¶ 10, 18, 29.) Finally, the WCJ found "that Dish Network did not justifiably rely on the [C]ertificate . . . when it permitted J&S [] to remain an active installation for Dish Network." (*Id.* ¶ 30.) For these

12

reasons, the WCJ granted Claimant's Claim Petition and the Guaranty Fund Claim Petition, granted the Guaranty Fund's Petition to Join Dish Network, and denied J&S's Petition to Join Brickstreet as neither J&S nor Dish Network established that Brickstreet was estopped from denying coverage. (COL ¶¶ 2-6.) The WCJ ordered J&S and Dish Network to pay Claimant's indemnity and medical benefits, with the Guaranty Fund being secondarily liable should either J&S or Dish Network default.

### B. Board Appeals

Both J&S and Dish Network appealed the WCJ's Order to the Board. The Board affirmed the WCJ's determination that Claimant was an employee of J&S when he was injured. The Board reviewed J&S's arguments that Claimant was not an employee, including Mr. Lumbard's testimony that although the IC Agreement expired, that agreement continued to define the work relationship, and found it unpersuasive, noting that J&S had both employees and independent contractors performing installations. (Board Opinion (Op.) at 12-13.) Looking at the credited testimony, the Board concluded that J&S "exercised significant control over the work to be done" by Claimant. (*Id.* at 13.) While the Board observed that "some indicia of control," such as requiring its logo on Claimant's truck and clothing and the use of approved parts, "can be attributed to Dish Network's requirements," the Board pointed to other factors, including that: Claimant had not been certified to install Dish Network and learned how to do so from Mr. Waltz; Claimant could not work for any other company, a change from his prior relationship with J&S; and J&S would stop assigning jobs if an installer's performance was unsatisfactory. (*Id.*) The Board concluded that, in any case, Claimant "did not operate his own business," citing that he had previously worked as an installer for another company before J&S. (*Id.*)

The Board also affirmed the WCJ's conclusions that Dish Network was a statutory employer of Claimant under Section 302(a) of the Act and Brickstreet was not estopped from denying coverage. The Board "discern[ed] no difference between" Dish Network's argument that it was error to find that Dish Network did not justifiably rely on the Certificate issued "and its contention that it cannot be a statutory employer because it complied with the requirements of [S]ection 302(d) and (i)." (*Id.* at 24.) The Board rejected these arguments, holding that Dish Network could not rely on the Certificate due to its boilerplate disclaimer language. (*Id.*)

Both J&S and Dish Network petition for review of the Board's Order.[14] The Court addresses J&S's appeal first because if we conclude J&S was not Claimant's employer, Claimant's injury would not be covered by the Act, and, in turn, Dish Network could not be found liable for coverage of that injury.

## II. J&S'S APPEAL
### *A. Parties' Arguments*

J&S asserts one issue in its appeal, contending the Board erred in affirming the WCJ's determination that Claimant, when he was injured, was an employee of J&S under *Universal Am-Can* and *American Road Lines*.[15] While acknowledging that the 2015 IC Agreement had a term of one year and did not renew, J&S argues that the evidence, particularly Mr. Lumbard's and Mr. Waltz's testimony,

---

[14] In reviewing the Board's adjudication, this Court considers whether constitutional rights were violated, errors of law were committed, or necessary findings of fact were supported by substantial evidence. *Stepp v. Workers' Comp. Appeal Bd. (FairPoint Commc'ns, Inc.)*, 99 A.3d 598, 601 n.6 (Pa. Cmwlth. 2014).

[15] J&S relies on *Travis v. Workers' Compensation Appeal Board (Bob Wagner Mill Carpet, Inc.)* (Pa. Cmwlth., No. 1548 C.D. 2001, filed November 8, 2001), in support of its arguments. However, Pennsylvania Rule of Appellate Procedure 126(b), Pa.R.A.P. 126(b), and Section 414(a) of this Court's Internal Operating Procedures, 210 Pa. Code § 69.414(a), permit the citation to unreported opinions issued after January 15, 2008, for persuasive purposes. *Travis* falls outside this rule having been issued in 2001.

established that the relationship continued on the same terms, up to the date of Claimant's injury, including the manner of assignments in two-hour windows. According to J&S, the evidence showed that Claimant decided whether to accept or reject installation orders; provided his own vehicle; and supplied his own tools, including clips and cables. It maintains that Claimant was financially responsible for antennas and receivers to be installed if they were not returned or used, was responsible for the gas and tolls he incurred, was paid by the installation, not the hours worked, and was required to purchase and provide proof of a commercial liability insurance, which reflects that Claimant operated his own business. J&S further points out that Claimant received a Form 1099, requiring him to pay his own taxes, was not prevented from performing services for other installation service companies, and was allowed to refuse orders, which he did when assignments went outside his area. J&S questions the Board's reliance on the fact that it has both employees and independent contractors performing the same duties as a reason to conclude Claimant is an employee. A reasonable view of all these facts, which J&S contends, are basically undisputed, establishes that Claimant controlled the decision of whether to work and the manner in which he did the installation work. As such, Claimant was an independent contractor and not an employee.[16]

Claimant argues a reasonable view of the credited evidence supports the conclusion that he was an employee of J&S when he was injured and concluding otherwise would require the Court to be "solicitous to find a contractorship rather than employment." (Claimant's Brief (Br.) at 19-20 (quoting *Southland Cable Co. v. Workmen's Comp. Appeal Bd. (Emmett)*, 598 A.2d 329, 331 (Pa. Cmwlth. 1991)).)

---

[16] Brickstreet and Dish Network provided written and/or oral arguments that were consistent with J&S's arguments as to why Claimant was an independent contractor, not an employee of J&S.

Claimant maintains that the credited evidence establishes that Dish Network exercised control over him and his work and that numerous factors of the common law test for employment are met. The existence of the expired IC Agreement and the facts that he was paid by the job and received a Form 1099 are not dispositive, as the Court must determine this issue based on the facts of the relationship itself, not just the documents. At oral argument, Claimant asserted that the commercial liability insurance policy is not dispositive, as the evidence showed that Claimant bought that insurance at times, but it was not clear whether it was purchased as a requirement of J&S or because Claimant thought it would be good to have. (J&S's R.R. at 84a-85a.) According to Claimant, he could not work as a Dish Network installer without J&S, which supplied the customers and the satellite dishes to be installed, as he is unlike a house painter, who can go door to door to solicit business, and, therefore, he was not engaged in a distinct occupation or business. J&S is in the regular business of installing satellites, and it uses both employees and independent contractors, who have the same skill set, to perform the same duties. While Claimant provided some of his own hand tools, he argues it was J&S that provided the essential tools and equipment necessary to complete the satellite installations. Ultimately, Claimant contends, J&S "controlled almost every aspect of Claimant's workday, from when he reported, [to] which customers he dealt with," and, therefore, J&S was his employer. (Claimant's Br. at 18.)

Finally, Claimant asserts the determination that he was J&S's employee is consistent with the Commonwealth's policies against the misclassification of employees, as reflected in the Construction Workplace Misclassification Act, 43 Pa.C.S. §§ 933.1-933.17 (Misclassification Act). The Misclassification Act defines "independent contractor" for purposes of WC, unemployment compensation (UC),

16

and worker classification, and, while not implicated here, shows a legislative intent to discourage misclassifying employees to avoid paying, *inter alia*, WC benefits. Claimant notes that were it to apply, none of the requirements for being an independent contractor are met here,[17] which is indicative of the relationship between him and J&S.

---

[17] Section 3 of the Misclassification Act provides:

(a)    GENERAL RULE.--For purposes of [WC], [UC] and improper classification of employees provided herein, an individual who performs services in the construction industry for remuneration is an independent contractor only if:

(1) The individual has a written contract to perform such services.
(2) The individual is free from control or direction over performance of such services both under the contract of service and in fact.
(3) As to such services, the individual is customarily engaged in an independently established trade, occupation, profession or business.

(b) CRITERIA.--An individual is customarily engaged in an independently established trade, occupation, profession or business with respect to services the individual performs in the commercial or residential building construction industry only if:

(1) The individual possesses the essential tools, equipment and other assets necessary to perform the services independent of the person for whom the services are performed.
(2) The individual's arrangement with the person for whom the services are performed is such that the individual shall realize a profit or suffer a loss as a result of performing the services.
(3) The individual performs the services through a business in which the individual has a proprietary interest.
(4) The individual maintains a business location that is separate from the location of the person for whom the services are being performed.
(5) The individual:

(i) previously performed the same or similar services for another person in accordance with paragraphs (1), (2), (3) and (4) and while free from

**(Footnote continued on next page…)**

*B. Discussion*

Since the earliest years of the WC movement, our Supreme Court has recognized the distinction, for compensation purposes, between independent contractors and employees. *Gailey v. State Workmen's Ins. Fund*, 133 A. 498, 499 (Pa. 1926). The high court has long and consistently directed that "neither the compensation authorities nor the courts should be solicitous to put claimants in th[e] position [of independent contractor] when a reasonable view of the [credited] evidence warrants a finding that the injured person was an employee." *Id.*; *see, e.g.*, *Universal Am-Can*, 762 A.2d at 331; *Thomas v. Bache*, 40 A.2d 495, 497 (Pa. 1945). This Court has followed suit, recognizing the remedial nature of the Act. *See, e.g.*, *IDI Logistics, Inc. v. Clayton (Workers' Comp. Appeal Bd.)*, 284 A.3d 248, 259 (Pa. Cmwlth. 2022); *Berkebile Towing & Recovery v. Workers' Comp. Appeal Bd. (Harr)*, 254 A.3d 783, 790 (Pa. Cmwlth. 2021). Under this standard, a court's "sole concern is to see that [legally] competent proofs are present which support the material points of the claimant's case" and so long as "the record [] contain[s] evidence on these essential points, and, be the proofs meager or plentiful, weak or strong," the WCJ's "findings that . . . [a claimant] was not acting as an independent contractor[] will not be disturbed." *Gailey*, 133 A. at 500-01. The Supreme Court

---

direction or control over performance of the services, both under the contract of service and in fact; or

(ii) holds himself out to other persons as available and able, and in fact is available and able, to perform the same or similar services in accordance with paragraphs (1), (2), (3) and (4) while free from direction or control over performance of the services.

(6) The individual maintains liability insurance during the term of this contract of at least $50,000.

43 P.S. § 933.3.

18

later added that, for a claimant to establish an employment relationship, the "inferences favoring the claim [of employment] need make only **slightly** stronger appeal to reason than those opposed." *Universal Am-Can*, 762 A.2d at 330 (emphasis added).

Claimants seeking WC benefits must establish that they sustained an injury in the course of their employment and that the injury resulted in a loss of earning power. "It is a claimant's burden to establish an employer/employee relationship in order to receive benefits." *Id*. The Act defines "employe" as one who is the "servant" of the employer, and it defines "employer" as the "master." Sections 103 and 104 of the Act, 77 P.S. §§ 21, 22. The nature of a working relationship "is a question of law based on the facts presented in each case." *Am. Road Lines*, 39 A.3d at 610.

The Supreme Court has explained the common law factors relevant to the determination of whether a claimant works as an employee or as an independent contractor, as follows:

> While no hard and fast rule exists to determine whether a particular relationship is that of employer-employee or owner-independent contractor, certain guidelines have been established and certain factors are required to be taken into consideration:
>
> "Control of manner work is to be done; responsibility for result only; terms of agreement between the parties; the nature of the work or occupation; skill required for performance; whether one is engaged in a distinct occupation or business; which party supplied the tools; whether payment is by the time or by the job; whether work is part of the regular business of the employer, and also the right to terminate the employment at any time." *Stepp v. Renn*, [] 135 A.2d 794[, 796] ([Pa. Super.] 1957). []

*Universal Am-Can*, 762 A.2d at 333 (citing *Hammermill Paper Co. v. Rust Eng'g Co.*, 243 A.2d 389, 392 (Pa. 1968)) (emphasis added). The high court further

19

explained that whether "some or all of these factors exist in any given situation is not controlling." *Id.*

The common law test provides that "control over the work to be completed and the manner in which it is to be performed are the primary factors in determining employee status." *Id.* Other relevant factors "include the putative employer's withholding of wages for income taxes, acquisition of (or failure to acquire) [WC] insurance, and the existence of a signed contractor agreement." *IDI Logistics*, 284 A.3d at 255. This last factor must be viewed with "caution . . . in light of the potential for employers to use them as a means of avoiding legitimate [WC] liability." *Id.*[18] Because every case is fact specific, it is unnecessary that each of these factors be present to make the determination of the nature of the employment relationship. *J. Miller Co. v. Mixter*, 277 A.2d 867, 869 (Pa. Cmwlth. 1971).

We must also remain cognizant that

> the WCJ is the ultimate fact finder in [WC] cases and is entitled to weigh the evidence and assess credibility of witnesses. *Montano v. Advance Stores Co., Inc. (Workers' Comp. Appeal Bd.)*, 278 A.3d 969, 978 n.4 (Pa. Cmwlth. 2022) (citation omitted). "The WCJ's authority over questions of credibility, conflicting evidence and evidentiary weight is unquestioned." *A&J Builders, Inc. v. Workers' Comp. Appeal Bd. (Verdi)*, 78 A.3d 1233, 1238 (Pa. Cmwlth. 2013) (citation omitted). . . . "[I]t is irrelevant whether the record contains evidence to support findings other than those made by the WCJ; the critical inquiry is whether there is evidence to support the findings actually made." *Lahr Mech. v. Workers' Comp. Appeal Bd. (Floyd)*, 933 A.2d 1095, 1101 (Pa. Cmwlth. 2007) (citation omitted).

*Lebanon Transit v. Schaeffer*, 341 A.3d 203, 209 (Pa. Cmwlth. 2025).

---

[18] *See also* Richard R. Carlson, *Why the Law Still Can't Tell an Employee When It Sees One and How It Ought to Stop Trying*, 22 BERKELEY J. EMP. & LAB. L. 295, 341 (2001) (noting that a test for determining employee/employer relationship that "giv[es] significant weight to a written contract between the parties raises the risk that employers will create the appearance of an independent contractor relationship on paper simply to avoid employment laws").

20

Applying the above long-settled legal standards to the credited evidence, we discern no error or abuse of discretion in the Board's conclusion that Claimant met his burden of proving an employment relationship with J&S. The credited evidence and facts here support the legal conclusion that Claimant is an employee, not an independent contractor, as they favor, both directly and inferentially, the claim of employment and "make [more than a] slightly stronger appeal to [that conclusion] than those opposed." *Universal Am-Can*, 762 A.2d at 330.

Claimant credibly testified that: he **worked** for J&S **full-time** once the IC Agreement expired and could **not work** for any **other company**; J&S was responsible for Claimant's background check and obtaining a tech number for Claimant from Dish Network; **J&S trained Claimant** on how to install and repair Dish Network equipment; the IC Agreement he initially signed **expired** and no new agreement was signed; the **terms of working** for J&S **changed** from those during that agreement; he **could no longer refuse jobs**, hire a subcontractor, or bring a helper to jobs; Claimant was not required to show proof of WC insurance and did not do so; J&S provided the major equipment for installing and repairing Dish Network satellites; and **Claimant lacked discretion in the manner he performed his job**, such as where installations occurred or resolving issues with customers, because **all questions had to be referred to J&S**. (FOF ¶¶ 3a-c, 16; J&S's R.R. at 14a, 16a-17a, 20a-22a, 25a-29a, 32a-39a, 41a-42a, 44a-48a, 59a-60a, 64a-71a, 73a-75a, 78a-84a, 96a.)

Claimant also testified that he had uniforms with J&S's and Dish Network's logos on them, and he had an encrypted application on his cell phone through which **J&S scheduled his jobs, tracked him,** and **scheduled another installation if he finished early**. (FOF ¶¶ 3cVII, 16; J&S's R.R. at 20a-22a, 45a-46a, 73a, 83a, 103a.)

21

According to Claimant, it was J&S that advised him when he lost his technician number for Hughes Net, which resulted in J&S laying Claimant off, only for it to rehire and train him to install Dish Network systems. (FOF ¶¶ 3b-c, 16; J&S's R.R. at 85a-87a.) While Claimant used his own vehicle and paid for tolls and gas, **J&S paid him more per job** than those who used J&S's vans **to cover his expenses**. (FOF ¶¶ 3c, 16; J&S's R.R. at 44a-45a, 81a-83a, 103a-04a.) Finally, it is undisputed that J&S's regular business is the selling and installing of satellite internet, phone, and video systems, which is the work Claimant performed for J&S. (J&S's R.R. at 14a, 31a.)

"[A] reasonable view of th[is credited] evidence warrants a finding that [Claimant] was an employee," *Gailey*, 133 A. at 499, as it supports, among other conclusions, that J&S had control over Claimant's work, or had the right to exercise that control, even if it did not do so. This evidence certainly allows "at least slightly stronger inferences in favor of employment status," *IDI Logistics*, 284 A.3d at 259 (quoting *Universal Am-Can*, 762 A.2d at 330-31; *Thomas*, 40 A.2d at 497), which is all that is required by our precedent to establish an employment relationship, *Universal Am-Can*, 762 A.2d at 330. Indeed, the ability to schedule a worker's activities, the inability to work for other employers, and the worker's inability to have their own employees have been considered **key factors** that support the existence of an employment relationship. Richard R. Carlson, *Why the Law Still Can't Tell an Employee When It Sees One and How It Ought to Stop Trying*, 22 BERKELEY J. EMP. & LAB. L. 295, 346, 350, 352 (2001) (stating the last of these, the ability to hire employees, is "[p]erhaps the most likely sign that a worker is not an employee").

22

Many of J&S's arguments, including that the terms of Claimant's relationship with J&S did not change after the expiration of the IC Agreement, that Claimant paid for his tolls, gas, and vehicle insurance and was not paid more to cover those costs, and that Claimant had discretion in performing his work and provided all of the necessary tools to do so, are based on testimony of Mr. Lumbard and Mr. Waltz, which **conflicted** with Claimant's testimony. The WCJ accepted Mr. Lumbard's and Mr. Waltz's testimony on a **very limited basis** and **rejected** the remainder. Claimant credibly testified that things did change after the IC Agreement expired, J&S provided the major equipment and the other tools needed, but he chose to use his own small tools, which were left over from his previous installation positions, and that J&S paid Claimant more because he used his truck to cover expenses such as tolls and gas. (FOF ¶¶ 3c, 16; J&S's R.R. at 33a-34a, 44a-45a, 79a, 81a-83a, 103a-04a.) We are unquestionably bound by the WCJ's credibility determinations. *Lebanon Transit*, 341 A.3d at 209.

Moreover, to the extent J&S relies on the commercial liability insurance policy, the IC Agreement, and Claimant being issued a Form 1099, this evidence is not persuasive in light of the other evidence that supports the finding of employment. As to the insurance policy, Claimant testified that he provided J&S with certificates of liability insurance, that J&S did not initially require that he provide liability insurance, and that the policy was something that Claimant had from when he worked with a prior installation company and thought it was "a good idea" to continue having. (J&S's R.R. at 83a-84a (emphasis added).) Claimant explained J&S **changed** its policy to requiring him to have liability insurance and advised him of the change via email sometime in 2018 or 2019. (*Id.* at 84a.) The **WCJ credited Claimant's testimony** and did not find the commercial liability insurance as a

23

reason to discount the other evidence supporting employment. J&S's reliance on testimony that it always required liability insurance or that the terms of the IC Agreement remained in place and unchanged is misplaced because that testimony **was rejected by the WCJ**. (FOF ¶¶ 16, 18, 20.)

As for the IC Agreement and the use of the Form 1099, this Court has recognized that there are some factors, controlled by employers, that must be viewed with caution because of "the potential for employers to use them as a means of avoiding legitimate [WC] liability," such as independent contractor agreements. *IDI Logistics*, 284 A.3d at 255. Notably, while J&S indicates that nothing changed in its relationship with Claimant after the expiration of the IC Agreement, one major change occurred when Claimant was **laid off** after losing his Hughes Net tech number and was **hired back** to install Dish Network. Thus, it appears there was a break in J&S and Claimant's relationship, raising questions about the claimed continuity of the IC Agreement, even if J&S's witnesses' testimony had been credited. Under these circumstances, particularly considering the testimony credited by the WCJ rather than that which was not, and in light of the other indicia of control over Claimant's work J&S exercised or could exercise, we view this evidence with caution and do not find them dispositive as to whether Claimant was an employee or independent contractor.

Finally, J&S questions any reliance on the fact that it has both employees and independent contractors performing installation services to conclude that Claimant was an employee. Two of the factors considered in the common law test is "whether the work is part of the regular business of the employer" and the "skill required for performance" of the work, *Universal Am-Can*, 762 A.2d at 333, and it is undisputed that installing satellite dishes is part of J&S's regular business and that J&S's

employees and independent contractors must perform to the same standards. The fact that J&S uses both employees and independent contractors to perform the activities that are a regular part of its business and requires the same level of skill and expectations of performance raises questions about the misclassification of the independent contractors. *See* Carlson, *supra*, at 345 ("In general, if the employer itself regularly performs the work in question, using at least some workers who are unquestionably employees, as well as those whose status is in question, the work is part of the employer's usual business."). Although the Misclassification Act is not directly implicated in this matter, Claimant's points regarding the legislative intent found in that statute as preventing the misclassification of employees as independent contractors for WC benefit purposes are well taken.

Ultimately, under our Supreme Court's precedent, the Court's "sole concern" in these cases should be ensuring that legally "competent proofs are present which support the material points of the claimant's case" and as long as "the record [] contain[s] evidence on these essential points, and, be the proofs meager or plentiful, weak or strong," the "findings that . . . [a claimant] was not acting as an independent contractor[] will not be disturbed." *Gailey*, 133 A. at 500-01. The inferences from the evidence that "favor[] the claim of [employment] need make only **slightly stronger appeal** to reason than those opposed." *Universal Am-Can*, 762 A.2d at 330 (emphasis added). The application of these longstanding principles to the credited evidence here supports affirming the Board's decision, and the fact that there is evidence in the record that could support a contrary conclusion is of no moment. *Lebanon Transit,* 341 A.3d at 209. Because the substantial, credited evidence in this matter meets, if not exceeds, these standards and supports the

Board's legal conclusion that Claimant was an employee of J&S on October 25, 2019, the Board's Order is affirmed in that regard.

Having concluded that there was no error in the Board affirming the WCJ's determination that Claimant was an employee of J&S on October 25, 2019, we turn to Dish Network's appeal of the Board's Order.

### III. DISH NETWORK'S APPEAL
#### A. *Parties' Arguments*

Dish Network argues the Board erred in finding it liable for the payment of WC benefits because it "did everything that a responsible contractor should do," (Dish Network's Br. at 9), in requesting the Certificate, which was issued by Brickstreet's agent, Mr. Hiney, and relying on the representation therein that J&S had WC coverage. Dish Network asserts that, under the ISP Agreement, J&S was required to provide a certificate of insurance as evidence of WC insurance coverage. When J&S's 2018-19 WC policy was expiring, Dish Network notified J&S that it had to provide a new certificate, or its contract would be discontinued. Mr. Hiney, using his authority as an agent of Brickstreet, issued the Certificate stating, *inter alia*, that a policy of WC insurance had been issued by Brickstreet to J&S for the policy period from September 25, 2019, to September 25, 2020. Upon receipt of the Certificate, Dish Network continued its contract with J&S to provide installation services. Dish Network maintains that these circumstances warrant relief under *Travelers Casualty and Surety Company v. Castegnaro*, 772 A.2d 456 (Pa. 2001) (*Travelers Casualty*), in which our Supreme Court held that the insurer, as principal, was liable to third parties for the misrepresentation and negligent acts of its agent, even if not authorized or known by the principal. Here, Dish Network maintains that the Certificate attested to insurance coverage that did not exist and, as such, the liability for Claimant's injury rests upon Brickstreet not "the innocent stranger," *i.e*.,

26

Dish Network. (Dish Network's Br. at 11 (quoting *Travelers Cas.*, 772 A.2d at 460).)

Dish Network further argues that the WCJ's finding that Mr. Hiney was acting "at the behest of J&S [] (not Brickstreet) when he issued the [C]ertificate . . . on September 24, 2019," is of no consequence because it is always the customer that requests the certificate of insurance. (FOF ¶ 29.) According to Dish Network, the WCJ also found, critically, that Mr. Hiney was Brickstreet's agent and was authorized to issue certificates of insurance on the insurer's behalf. (Dish Network's Br. at 25-26; FOF ¶ 6c ("As an agent for Brickstreet," Mr. Hiney was "authorized to solicit and place insurance policies for Brickstreet.").) Dish Network argues that contrary to the WCJ's and Board's conclusions, Brickstreet should be estopped from denying the existence of coverage because its authorized agent led Dish Network to believe that a 2019-20 policy had been issued, and Dish Network acted in reliance on that belief. (Dish Network's Br. at 11, 21 (citing *Westinghouse Elec. Corp./CBS v. Workers' Comp. Appeal Bd. (Korach)*, 883 A.2d 579 (Pa. 2005)).) The boilerplate disclaimer in the Certificate relied upon by the WCJ did not alert Dish Network "to even a possibility" that the certification issued by Brickstreet was false, particularly where the Certificate included a policy number and the disclaimer language used did not warn of the non-existence of a policy. (*Id.* at 12, 17-21.)

Dish Network maintains that the Board's analysis of its estoppel issue as being informed by Section 302(a) is erroneous. The Board held that Dish Network was a statutory employer under Section 302(a) of the Act for the stated reason that it was "the first financially responsible employer in the chain[.]" (Board Op. at 15.) Dish Network argues, however, that Section 302(a) is inapplicable where a WC insurer, such as Brickstreet, is responsible for the compensation. In Dish Network's view,

27

"[t]he legislative intent behind [S]ection 302[(a)] does not drive the [] estoppel issue," and the Board erred by treating the two issues as one.[19] (Dish Network's Br. at 24.)

Brickstreet argues that none of the issues raised by Dish Network in its brief were preserved for appeal. It maintains that the only issue raised to the Board was whether the WCJ erred by failing to apply the doctrine of estoppel to hold Brickstreet liable for Claimant's compensation benefits. Dish Network did not challenge the WCJ's findings; and, even if they were challenged, they are supported by substantial evidence. According to Brickstreet, the WCJ found that J&S did not have a policy of insurance in effect at the time of the accident; Mr. Hiney was acting as J&S's representative in connection with the Certificate; and Dish Network did not justifiably rely on the Certificate given its disclaimer language. (FOF ¶ 6b (Hiney "acts as an agent for the policyholder when pricing and placing coverage").) Brickstreet contends that "it has long been hornbook law" that an "insurance broker" is "the agent of the insured; not of the insurer." (Brickstreet's Br. at 30 (citing *Taylor v. Crowe*, 282 A.2d 682, 682 (Pa. 1971)).) The Certificate was issued "solely for the benefit of J&S;" not Brickstreet. (*Id.* at 31.) Brickstreet maintains that reliance on *Travelers Casualty* is misplaced as that case is factually distinguishable.

Brickstreet also argues that the doctrine of estoppel does not apply because none of the requirements for that relief are met. It observes that J&S was the promisor, not Brickstreet, there was no justifiable reliance on the Certificate based on its disclaimer, and justice can be afforded even if Brickstreet is not estopped

---

[19] Although Dish Network preserved a challenge to the Board's finding that it was a statutory employer notwithstanding its compliance with Section 302(d) and (i), it decided to forego that issue in its arguments. (Dish Network's Br. at 22 n.1.) Claimant's brief addresses only the Board's statutory employer finding and offers no argument on the estoppel arguments.

28

because, as a statutory employer, Dish Network can be fully indemnified by J&S under both the Act and ISP Agreement, the latter of which expressly provides that "J&S will be liable to indemnify Dish Network for any breach of the agreement." (*Id.* at 34, 40.)  Brickstreet asserts that, here, J&S breached its contract with Dish Network, and it is J&S, not Brickstreet, that is responsible for the full amount of Dish Network's loss.  (*Id.* at 41-42 (citing *Wilkinsburg v. Trumbull-Denton Joint Venture*, 568 A.2d 1325, 1326 (Pa. Super. 1990)).)

Dish Network replies that it has preserved its arguments because it specifically challenged the relevant findings of fact as not being supported by substantial evidence, which includes a review for the capricious disregard of competent evidence, per *Leon E. Wintermeyer, Inc. v. Workers' Compensation Appeal Board (Marlowe)*, 812 A.2d 478, 497 (Pa. 2002).  It also points to its express challenge of the WCJ's failure to apply the doctrine of equitable estoppel in its appeal to the Board.  In support, it cites *Albert A. Moran, Jr. v. Pezzano*, (Pa.Work.Comp.App.Bd., Nos. A20-1095, A21-0006, filed Sept. 30, 2021), 2021 WL 4709639, a Board case applying agency principles and equitable estoppel to preclude an insurer from denying coverage based on the representations of an insurance agent, and its Petition for Review to this Court, which encompasses the arguments being raised now.  This is what is needed to preserve issues under *Jonathan Sheppard Stables v. Workers' Compensation Appeal Board (Wyatt)*, 739 A.2d 1084 (Pa. Cmwlth. 1999).

As to the merits of its position, Dish Network argues there can be no real dispute that Mr. Hiney was acting as Brickstreet's agent when he issued the Certificate based on the testimony of Mr. Hiney and Ms. Harmon and the Agency Agreement between Davis Insurance Agency and Brickstreet.  Dish Network asserts

that this Court in *Duquesne Truck Service v. Workmen's Compensation Appeal Board (McKeesport Truck Service)*, 644 A.2d 271 (Pa. Cmwlth. 1994), and the Board in *Moran*, applied the principles of agency and equitable estoppel to preclude an insurer from denying coverage under circumstances similar to those here. Dish Network further argues that justifiable reliance is a part of the burden of proof to establish equitable estoppel and is a conclusion of law that must be supported by findings of fact. Dish Network reiterates that its reliance on the Certificate was detrimental in that it was found to be Claimant's statutory employer and had to pay the WCJ's award due to J&S's financial inability to do so; a financial inability that likely precludes Dish Network from seeking relief from J&S. Finally, Dish Network maintains Brickstreet's reliance on *Taylor* for the difference between an insurance agent and an insurance broker is misplaced because of the evidence that Mr. Hiney was acting as Brickstreet's agent.

B. *Discussion*
1. Waiver

We first address Brickstreet's contention that Dish Network has not preserved its current arguments for appellate review because they were not raised in its appeal to the Board. Section 111.11(a)(2) of the Department of Labor and Industry's regulations provides that

> [a]n appeal . . . shall be filed with the Board on a form provided by the Board. . . . All forms must contain the following information:
> . . . .
> [a] statement of the particular grounds upon which the appeal is based, including reference to the specific findings of fact which are challenged and the errors of the law which are alleged. General allegations which do not specifically bring to the attention of the Board the issues decided are insufficient.

30

34 Pa. Code § 111.11(a)(2). We have held that a party waives an issue for appellate review if the issue is not included in the party's appeal documents to the Board. *Jonathan Sheppard Stables*, 739 A.2d at 1088-89 & n.6. Similarly, the failure to raise a claim of error with "any degree of specificity in [an] appeal to the Board," also results in the waiver of claim for appellate review. *Id.* at 1088-89.

After reviewing Dish Network's appeal documents filed with the Board, we find that Dish Network has sufficiently raised the issues it currently argues therein and, therefore, those issues are preserved for appellate review. Relevantly, Dish Network challenged Findings of Fact 4, 5,7, 10, 11, 18, 19, 27, 28, 29, and 30, as not being supported by substantial evidence and/or as being in error. All of these findings relate, at least in part, to the WCJ's ultimate conclusions that Dish Network could be liable here as a statutory employer and Brickstreet was not estopped from denying coverage, (Certified Record (C.R.) at Item 19.) Included in that challenge were the findings that: Dish Network was a statutory employer under Section 302; Mr. Hiney was acting at J&S's behest, not on Brickstreet's behalf, when he issued the Certificate; and Dish Network did not justifiably rely on the Certificate because of the disclaimer contained therein. (FOF ¶¶ 7, 19, 28-30.) As Dish Network points out, whether a WCJ capriciously disregards competent evidence is a part of every substantial evidence inquiry pursuant to *Wintermeyer, Inc.*, 812 A.2d at 497. Dish Network also asserted that "[t]he WCJ erred by failing to apply the Doctrine of Equitable Estoppel." (C.R. at Item 19 (citing *Moran*).) In *Moran*, the Board applied agency principles and equitable estoppel to preclude an insurer from denying coverage based on the representations of an insurance agent that were detrimentally relied upon. *Moran*, 2021 WL 4709639, at *12-15. We are satisfied that Dish Network sufficiently raised the issues presently before the Court in its appeal

31

documents filed with the Board and, therefore, do not find that they are waived for appellate review.[20]

> 2. <u>Whether the Board erred in concluding that Dish Network had liability for Claimant's work injury as a statutory employer.</u>

Under Section 302(a) of the Act,

certain "contractors" bear secondary liability for compensation to injured workers employed by their "subcontractors," as follows:

> A contractor who subcontracts all or any part of a contract and his insurer shall be liable for the payment of compensation to the employes of the subcontractor unless the subcontractor primarily liable for payment of such compensation has secured its payment as provided for in this [A]ct.

*Six L's Packing Co. v. Workers' Comp. Appeal Bd. (Williamson)*, 44 A.3d 1148, 1150 (Pa. 2012) (quoting 77 P.S. § 461). A contractor that is secondarily liable for a work injury is known as the statutory employer for purposes of the Act. *Id.* Here, the WCJ found, and the Board affirmed, that Dish Network was Claimant's statutory employer and secondarily liable for his injury based, relevantly, on J&S's lack of WC insurance and the WCJ's rejection of Dish Network's equitable estoppel claim. (FOF ¶¶ 27-28, 30; COL ¶¶ 4, 6; Board Op. at 23-24.)

Dish Network maintains it is not a statutory employer because the Board and WCJ erred in concluding Brickstreet was not equitably estopped from denying WC coverage to J&S based on the actions of Brickstreet's admitted agents, Mr. Hiney and the Davis Insurance Agency. Dish Network argues that Section 302(a)'s provisions are unrelated to whether estoppel should apply here and are not

---

[20] We further observe that some of Dish Network's arguments are based on errors it asserts the Board made in the Board's analysis, which could not be raised in its appeal from the WCJ's Decision. Instead, Dish Network raised these issues in its Petition for Review filed with this Court. (*See* Petition for Review ¶ 5B, 5E, and 5F.)

implicated if Brickstreet is estopped from denying coverage. Dish Network further asserts it is an innocent, third party that relied upon Mr. Hiney's representations through the Certificate that J&S had WC coverage through Brickstreet, and Brickstreet should be estopped from denying coverage at least as to Dish Network.

It is well settled that the WC authorities, including the Board, have jurisdiction over "the general question of liability of an insured" and to "determine the liability of an insurer." *Felmont Oil Corp. v. Workmen's Comp. Appeal Bd. (Furman)*, 525 A.2d 455, 456 (Pa. Cmwlth. 1987). "[T]he compensation authorities have the power to resolve not only whether a policy is in effect, but also, to determine the coverage provided by the policy." *Id.* at 456-57. *See also Rockwood Ins. Co. v. Workmen's Comp. Appeal Bd.*, 405 A.2d 569, 571 (Pa. Cmwlth. 1979) (same). They also have the authority to determine whether an insurer may be equitably estopped from denying WC coverage in certain circumstances. *Jarvis v. Workmen's Comp. Appeal Bd.*, 441 A.2d 1189 (Pa. 1981); *Duquesne Truck Serv.*, 644 A.2d 271; *Moran*, 2021 WL 4709639.

Equitable estoppel is applicable in WC matters. *Westinghouse Elec. Corp./CBS*, 883 A.2d 579. It arises when a defendant "by [its] acts, representations, or admissions . . . intentionally, or through culpable negligence induces another to believe certain facts to exist and such other rightfully relies and acts on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts." *Id.* at 586. "The party claiming equitable estoppel has the burden of proving it by clear and convincing evidence." *Walker v. Workmen's Comp. Appeal Bd. (Sherbren Mfg.)*, 656 A.2d 164, 170 n.10 (Pa. Cmwlth. 1995). "Whether the facts of a case give rise to the application of the doctrine of equitable estoppel is a question of law that can be addressed by . . . this Court on appeal." *Cozzone v. Workers'*

33

*Comp. Appeal Bd. (PA Mun./E. Goshen Twp.)*, 41 A.3d 105, 109 n.5 (Pa. Cmwlth. 2012).

Brickstreet argues that the Board did not err in upholding the WCJ's rejection of Dish Network's estoppel claim because Mr. Hiney was not acting as its agent when he issued the Certificate, Brickstreet made no promises to Dish Network through that Certificate, Dish Network's reliance on the Certificate was not justifiable due to the disclaimer contained therein, and Dish Network is not prejudiced because it can seek indemnification from J&S. On the first point, Brickstreet asserts that it is well-settled law that an insurance broker, like Mr. Hiney, is an agent of the insured and not the insurer, *Taylor*, 282 A.2d at 682, and that the WCJ found that Mr. Hiney was acting on J&S's behest when he issued the Certificate. (FOF ¶ 29.) Therefore, Brickstreet maintains Mr. Hiney's actions in issuing the Certificate cannot be imputed upon it, and the Supreme Court's decision in *Travelers Casualty* does not provide Dish Network with relief.

A review of the case law on agency and apparent authority in the insurance context reveals that the issue of whom an insurance broker represents is not as clear cut as Brickstreet asserts. The Supreme Court, in *Taylor*, did state that "a long line of decisions has declared the broker to be the agent of the insured; not the insurer." 282 A.2d at 683. However, the *Taylor* Court also recognized that "[a] **broker may be found to have acted on behalf of [an] insurer**" if "there . . . [is] **some evidence of an authorization**, or **some fact from which a fair inference of an authorization** by the company might be deduced to make an insurance broker the agent of the company." *Id.* at 683-84 (internal citations and quotation marks omitted) (emphasis added). Because no evidence existed in *Taylor* showing that the broker was an agent of the insurer, the Supreme Court applied the general rule. *Id.* at 684.

34

Our sister court, the Superior Court, has rejected the bright line distinction Brickstreet asserts as being "facile." *Sands v. Granite Mut. Ins. Co.*, 331 A.2d 711, 714 (Pa. Super. 1974).[21] That Court explained that "[t]he distinction between brokers and agents is no more helpful" where nothing precludes a finding that an entity had simultaneous authority to represent both the insurer and the insured. *Id.* at 714-15. *See also Kairys v. Aetna Cas. & Sur. Co.*, 461 A.2d 269, 273-74 (Pa. Super. 1983). In situations where the exercise of apparent authority results in "a third person chang[ing] his position in reasonable reliance on the principal's conduct, the principal is then estopped from denying the authority of the agent." *Stallo v. Ins. Placement Facility of Pa.*, 518 A.2d 827, 830 (Pa. Super. 1986). Based on these cases, we are not persuaded that whether Mr. Hiney was Brickstreet's agent can be resolved solely on his status as a broker but must be determined by considering whether the evidence presented demonstrates that he had either actual or apparent authority to act, and did act, as Brickstreet's agent when he issued the Certificate.

In *Duquesne Truck Service*, this Court held that an insurance company was required to provide WC coverage to a trucking company, even though no WC policy was issued, based on the actions of an insurance agent, including issuing certificates of insurance to the trucking company's customers indicating that the trucking company had WC insurance with the insurer. 644 A.2d at 274-75. In rejecting the insurance company's argument that it was not bound by the agent's actions and the certificates of insurance, this Court concluded the agent had apparent authority to bind the insurance company, defining that term as "that authority which, not actually

---

[21] "In general, Superior Court decisions are not binding on this Court, but they offer persuasive precedent where they address analogous issues." *Lerch v. Unemployment Comp. Bd. of Rev.*, 180 A.3d 545, 550 (Pa. Cmwlth. 2018).

granted, the principal knowingly permits the agent to exercise or holds him out as possessing." *Id.* at 274. To the extent the insurer argued it was not bound because the certificates of insurance were not issued following the proper procedure, the Court held that undisclosed rules known only by the agent and the insurer "cannot be invoked to defeat the contract the agent had apparent authority to make." *Id.* at 275.

The Board found *Duquesne Truck Service* instructive in *Moran*. In that case, the Board upheld a WCJ's use of agency principles and estoppel to find that an insurer was precluded from denying WC coverage based on the actions of an insurance agent with apparent authority to bind the insurer even where no policy was issued. There, an employer sought WC coverage from his agent, the agent took payment for a WC policy, issued a certificate of insurance identifying the insurer as providing coverage to the employer, and advised the employer, who had filled out an application for submission, that it had coverage, which the employer's owner believed. After an employee was injured, it was discovered that the agent never submitted a completed application and no policy had been issued. The insurer asserted it was not liable for the WC coverage, and the WCJ and the Board disagreed. The Board noted that the agent was authorized to sell and quote insurance products and to bind coverage on the insurer's behalf, as was confirmed by the insurer's witness. According to the Board, the employer's owner relied upon the authorized agent's misrepresentations and would be prejudiced if the insurer was permitted to deny the existence of the policy the insurer's agent purportedly placed. Although we are not bound by the Board's decision in *Moran*, it offers an analysis by the administrative entity charged with interpreting and enforcing the Act's provisions in a situation similar to the present matter.

36

A review of the record shows that Mr. Hiney had at least apparent authority, if not actual authority, to act as Brickstreet's agent, and did so when issuing the Certificate. Mr. Hiney testified he is an agent of Brickstreet and is authorized to solicit and place insurance policies for Brickstreet. (Dish Network's R.R. at 66a-69a.) He explained that when he placed the WC policy for J&S, he was acting as Brickstreet's agent. (*Id.*) As to the Certificate, Mr. Hiney acknowledged that he issued the Certificate on September 24, 2019, which showed that J&S had WC insurance in place from September 25, 2019, to September 25, 2020. (*Id.* at 73a-74a.) Additionally, the following exchange occurred on redirect:

> [Counsel:] Mr. Hiney, we've referred to a certificate of insurance and it has a date of September 24, 2019. And that's your signature. . . .
>
> [Mr. Hiney:] Yes, it is.
>
> [Counsel:] And you're identified as the authorized representative?
>
> [Mr. Hiney:] Yes, I am.
>
> . . . .
>
> [Counsel:] . . . As an agent for Brickstreet . . . , are you authorized to issue certificates of insurance?
>
> [Mr. Hiney:] Yes, I am.
>
> [Counsel:] And you did do that in this case?
>
> [Mr. Hiney:] Yes, I did.

(C.R. Item 29 at 45;[22] Dish Network's R.R. at 94a.) The Certificate identifies Brickstreet as J&S's WC insurer and Dish Network as the certificate holder, certifies

---

[22] Page 45 of the April 21, 2021 Notes of Testimony is not included in Dish Network's Reproduced Record.

37

"that the policies of insurance listed below have been issued to the insured named above for the policy period indicated," and is signed by Mr. Hiney as the "Authorized Representative" of Brickstreet. (Dish Network's R.R. at 4a, 94a.) The WCJ found Mr. Hiney's testimony credible. (FOF ¶ 17.)

Additionally, Brickstreet and the Davis Insurance Agency have an Agency Agreement through which Brickstreet has authorized the Davis Insurance Agency and its agents to "solicit applications and offer coverage for all lines of insurance Brickstreet is licensed to write." (Dish Network's R.R. at 7a.) Ms. Harmon, Brickstreet's representative, testified that the Davis Insurance Agency is an authorized agent of Brickstreet, and that Mr. Hiney is authorized to use Brickstreet's internal computer program to place Brickstreet insurance policies. (C.R. Item 30 at 48, 63.[23]) According to Ms. Harmon, J&S's WC policy was a "no touch policy," meaning that an individual authorized to use Brickstreet's computer program, like Mr. Hiney, could determine if an application met certain Brickstreet criteria, submit an insurance application through the program if it did, and no Brickstreet underwriter reviewed the application before a policy was quoted. (*Id.* at 46-47.) The agent then could accept or reject the quote at that time. (*Id.*) The WCJ found this testimony credible. (FOF ¶ 21.)

This credited evidence constitutes "some evidence of [] authorization," or, at a minimum, establishes facts that create "a fair inference of an authorization by" Brickstreet from which it "might be deduced to make [Mr. Hiney and the Davis Insurance Agency] the agent[s] of" Brickstreet such that they "may be found to have acted on behalf of the insurer." *Taylor*, 282 A.2d at 683-84 (citation omitted). It is apparent that Mr. Hiney was an agent of Brickstreet, or at least had the apparent

---

[23] The October 29, 2021 Notes of Testimony are not included in Dish Network's Reproduced Record.

authority to act as Brickstreet's agent, because the credited evidence shows that "the principal knowingly permit[ted] the agent to exercise or hold[] him out as possessing" that authority. *Duquesne Truck Serv.*, 644 A.2d at 274. Mr. Hiney could solicit and place insurance policies, including WC policies, for Brickstreet. Mr. Hiney had the authority from Brickstreet to issue "no touch" insurance policies and to act as Brickstreet's representative in issuing certificates of insurance certifying to a third party that the company named therein was covered by a Brickstreet insurance policy. Accordingly, Brickstreet's argument that equitable estoppel cannot apply because Mr. Hiney was not its agent is not persuasive.

In *Travelers Casualty*, the Supreme Court held that "[a]n agent of an [insurance] company . . . is more properly characterized as an extension of that entity, rather than a separate part of it." 772 A.2d at 460. A principal may be vicariously liable "to third parties for the . . . misrepresentations . . . of [its] agent, even though the principal did not authorize, justify, participate in or know of such conduct, . . . as long as they occurred within the agent's scope of" authority. *Id.* "This rule of liability is based on the premise that it is more reasonable for a principal, who has placed the agent in the position of trust and confidence, to be the one to suffer from the wrongful act of a third person, as opposed to an innocent stranger." *Id.* This test is similar to the standard for equitable estoppel, which applies when a party "by [its] acts, representations, or admissions . . . intentionally, or through culpable negligence induces another to believe certain facts to exist and such other rightfully relies and acts on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts." *Westinghouse*, 883 A.2d at 586.

Dish Network's estoppel argument is predicated on the Certificate, in which Mr. Hiney certified that a WC insurance policy **had been issued** to J&S by Brickstreet beginning September 25, 2019, upon which Dish Network relied to continue allowing J&S to install satellite dishes. A certificate of insurance is "[a] document evidencing an insurance policy and setting forth the general terms, including types of coverage, the policy period, and monetary limits." "Certificate of insurance," *Black's Law Dictionary* (12th ed. 2024); *see also Blackburn, Nickels & Smith, Inc. v. Nat'l Farmers Union Prop. & Cas. Co.*, 482 N.W.2d 600, 603 (N.D. 1992) ("A [c]ertificate of [i]nsurance is a document evidencing the fact that an insurance policy has been written and includes a statement of the coverage of the policy in general terms."). The Certificate, issued on September 24, 2019, and signed by Mr. Hiney as Brickstreet's "Authorized Representative," states: "This is to certify that the policies of insurance listed below have been issued to the insured named above for the policy period indicated." (Dish Network R.R. at 4a.) The "insured named above" is J&S. (*Id.*) It contains a WC policy number, a coverage period from September 25, 2019, to September 25, 2020, and the WC coverage limits per accident or disease. The Certificate names Dish Network as the "Certificate Holder." (*Id.*) Finally, the Certificate states that if any of the policies described therein were cancelled before they expired "notice will be delivered in accordance with the policy provisions." (*Id.*)

We are mindful that "[w]hether the facts of a case give rise to the application of the doctrine of equitable estoppel is a question of law that can be addressed by . . . this Court on appeal." *Cozzone*, 41 A.3d at 109 n.5. There can be no reasonable dispute that when Mr. Hiney issued the Certificate on September 24, 2019, no renewal of J&S's Brickstreet WC policy for the period beginning September 25,

40

2019, had occurred. Mr. Hiney admitted that, as of his September 24, 2019 certification, **he knew no new policy covering the next year was in effect** but issued the Certificate believing J&S would be renewing the policy. (Dish Network's R.R. at 73a-74a, 79a-81a.) He also acknowledged that **he knew the Certificate was going to be provided to Dish Network**. (C.R. Item 29 at 47.[24]) Finally, Mr. Hiney agreed that he issued the Certificate using his authority from Brickstreet, meaning it was within the scope of that authority. The Certificate was needed for J&S to meet its contractual obligations under Paragraph 12 of the ISP Agreement, which required J&S to carry WC insurance, and, absent the Certificate, Dish Network would no longer use J&S as an installer. (FOF ¶ 9b-c.) Based on the Certificate containing Mr. Hiney's certification that J&S had a WC policy covering the next year, Dish Network continued using J&S. (*Id.* ¶ 9d.) Accordingly, Dish Network, a third party, relied upon Mr. Hiney's misrepresentation of the fact that J&S had WC coverage after September 25, 2019, which induced Dish Network to continue using J&S notwithstanding its uninsured status. This misrepresentation of the fact of J&S's WC coverage, ultimately, resulted in prejudice to Dish Network—it being declared Claimant's statutory employer and liable for Claimant's WC injury under Section 302(a).

Brickstreet argues that there was no error in denying Dish Network's estoppel claim because, it asserts, the WCJ found that Mr. Hiney was acting at J&S's "behest" when he issued the Certificate and that Dish Network's reliance on the Certificate to allow J&S to continue as an installer was not justifiable because of the disclaimer contained therein, finding Ms. Trammel's testimony not credible on that point. (FOF ¶¶ 29-30; Brickstreet's Br. at 39.) On the first point, Dish Network maintains that it

---

[24] Page 47 of the April 21, 2021 Notes of Testimony is not included in Dish Network's Reproduced Record.

is always the insured that requests certificates of insurance, making the fact that J&S requested it here of no consequence, and the WCJ found that Mr. Hiney was Brickstreet's agent and Mr. Hiney credibly testified that he issued the Certificate based on his authority as an agent of Brickstreet. As for the second point, Dish Network contends the WCJ's finding regarding reliance was a reviewable conclusion of law that was based on boilerplate language contained in the Certificate. Dish Network asserts that it did all that it could do in requesting J&S to provide a Certificate demonstrating WC coverage and reasonably relied upon the Certificate to its ultimate detriment. Upon review, we are persuaded by Dish Network's arguments that the WCJ erred in holding that Brickstreet was not estopped from denying coverage, at least as to Dish Network.

Brickstreet relies on the WCJ finding that Mr. Hiney was acting on J&S's "behest," when he issued the Certificate. (FOF ¶ 29.) "Behest" means "command or directive,"[25] and it would be the insured that would direct the issuance of a certificate of insurance, reflecting the insured's insurance policies, that would be given to a third party with whom the insured seeks to do business. It is unclear why an insurer would independently direct its agent to issue a certificate of insurance relating to one of its insureds to a third party. Moreover, that J&S directed the issuance of the Certificate does not mean that Mr. Hiney was not representing both J&S and Brickstreet when he issued the Certificate. An insurance agent or broker can have the authority to act simultaneously on behalf of the insurer and the insured, *Sands*, 331 A.2d at 714-15, and that is what happened here. J&S directed Mr. Hiney to issue a Certificate reflecting J&S's WC policy for the upcoming year, which

---

[25] "Behest," https://www.dictionary.com/browse/behest (last visited August 3, 2026); *see also* "Behest," https://www.merriam-webster.com/dictionary/behest (defining the term as "authoritative order: command") (last visited August 3, 2026).

would be sent to Dish Network as proof of such policy, and Mr. Hiney issued the Certificate using his authority as Brickstreet's agent knowing it was being provided to Dish Network as proof of J&S's WC insurance. (*See* Dish Network's R.R. at 6a.1, 73a-74a, 94a; C.R. Item 29 at 46-47.) Accordingly, this is not a reason to have found that the Certificate could not be relied upon by Dish Network.

Second, Brickstreet argues the WCJ did not find Dish Network's reliance on the Certificate was justified, citing the disclaimer contained within the Certificate and rejection of Ms. Trammel's testimony that the Certificate appeared to be in order and there was no reason to believe the coverage listed was not accurate based on the disclaimer. Here, the WCJ essentially held that the Certificate's disclaimer was dispositive as to whether the Certificate could be justifiably relied upon by Dish Network as proof of J&S's carrying WC insurance. But a review of the Act, precedent, and this record reveals that certificates of insurance are proof of WC insurance and that the disclaimer relied upon by the WCJ is boilerplate language commonly found on certificates of insurance.

In *Jordan v. Lost Forest Development, LLC*, 344 A.3d 489, 501-04 (Pa. Cmwlth. 2025), this Court recently explained that "[t]he Act contains several provisions to ensure that construction workers are protected by [WC] coverage," such as those that require proof of WC insurance be provided to third parties, and that certificates of insurance are sufficient to satisfy these proof of insurance requirements. Sections 302(d), 302(e), and 302(i) of the Act[26] reflect that certificates of insurance are to be accepted as proof of WC insurance. For example, Section 302(d) requires that a contractor must require a subcontractor to "present[] proof of insurance under this [A]ct" before subcontracting work. 77 P.S. § 462.1. Section

---

[26] Sections 302(e) and 302(i) were added by Section 6 of the Act of July 2, 1993, P.L. 190, 77 P.S. §§ 462.1, 462.2, 462.6.

43

302(e)(1) and (3), similarly requires that before a municipality can issue a building permit to a contractor, that contractor is "require[d] . . . to present proof of [WC] insurance[,]" that the "municipality . . . be named as a [WC] policy certificate holder[,]" and that the "certificate shall be filed with the municipality's copy of the building permit."  77 P.S. § 462.2(1), (3).  Critically, Section 302(i) specifically defines "**proof of insurance**" as "includ[ing] **a certificate of insurance** . . . demonstrating current coverage and compliance with the requirements of this [A]ct."  77 P.S. § 462.6 (emphasis added).  Thus, the Act, and this Court's precedent, establish that certificates of insurance are acceptable proof of WC insurance, and it is consistent with the Act that Dish Network required J&S to provide it with the Certificate to demonstrate that J&S carried WC insurance.

To reject Dish Network's reliance on the Certificate, the WCJ focused on the Certificate's disclaimer, which states:

> THIS CERTIFICATE IS ISSUED AS A MATTER OF **INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER**. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.  THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

(Dish Network's R.R. at 4a (some bold emphasis omitted); FOF ¶¶ 7, 30.)  There are multiple certificates of insurance in this record all of which bear the same disclaimer. In addition to the Certificate, the certificates of insurance J&S introduced to establish that Claimant had a commercial liability insurance policy contain this very same disclaimer.  (J&S's R.R. at 346a-50a.)  This is because the certificates **are issued on the same standardized form**, the "Accord 25," which is a used by insurers.  (Dish

Network's R.R. at 4a; J&S's R.R. at 346a-50a.) The same, or substantially similar, disclaimer language has been noted in numerous cases involving claims of estoppel against insurers who attempt to deny coverage notwithstanding the insurers' agent issued certificates of insurance. *See, e.g.*, *Quincy Mut. Fire Ins. v. Imperium Ins.*, 636 F. App'x 602, 603-04 (3d Cir. 2016); *W. Am. Ins. Co. v. J.R. Constr. Co.*, 777 N.E.2d 610, 613, 617-18 (Ill. App. Ct. 2002); *Blackburn, Nickels & Smith, Inc.*, 482 N.W.2d at 603. Accordingly, we agree with Dish Network's characterization of the disclaimer as being "boilerplate."

In arguing that the WCJ did not err in relying on the disclaimer, Brickstreet maintains Dish Network is attempting to acquire rights based on the Certificate, which is expressly disclaimed. (Brickstreet's Br. at 38.) This is a misunderstanding of Dish Network's position. Dish Network is not seeking to be named as an additional insured or to gain any rights from the Certificate, as Brickstreet suggests.[27] That Dish Network does not seek to be named an additional insured is confirmed by Paragraph 12.3 of the ISP Agreement, which specifically directs that Dish Network is **not** to be named an additional insured in any WC policy. (Dish Network's R.R. at 38a.) This distinction is also shown in the Certificate, which lists Dish Network as an additional insured for J&S's non-WC policies. (*Id.* at 4a.) Instead, Dish Network seeks to establish that it reasonably relied upon the **information** Brickstreet's agent, Mr. Hiney, **misrepresented** in the Certificate knowing that Dish

---

[27] The United States Court of Appeals for the Third Circuit held, in *Quincy*, that the certificate holder's reliance on the certificate of insurance as evidence of it **being an additional insured** covered by the policy listed therein was not justifiable because of the disclaimer and the fact that the certificate conflicted with the policy, which did not list the holder as an additional insured. 636 F. App'x at 605. Unlike the certificate holder in *Quincy*, Dish Network is not asserting that it has a right to coverage as an additional insured. Instead, Dish Network is arguing that it relied on the **information** contained in the Certificate representing that **J&S had WC coverage** for the period in question and at the amounts listed in that document.

Network was the recipient of the Certificate and would rely on that information, that Dish Network changed its position based on that misrepresentation, and that Dish Network was prejudiced by Brickstreet's refusal to abide by the representation made by its agent. If Brickstreet is estopped from denying coverage of J&S for the period represented in the Certificate, at least as against Dish Network, Dish Network could not be found to be liable as a statutory employer.

Examining the facts here, we conclude those "facts . . . give rise to the application of the doctrine of equitable estoppel," and the Board and the WCJ erred in concluding otherwise. *Cozzone*, 41 A.3d at 109 n.5. Mr. Hiney, as an authorized representative of Brickstreet and at the direction of J&S, issued the Certificate containing information that **he knew was not accurate** at the time and knowing that the Certificate would be forwarded to Dish Network as proof of J&S's WC coverage for the period of time set forth therein. Dish Network relied upon the information contained within the Certificate and continued to use J&S as an installer, which ultimately led to Dish Network being named Claimant's statutory employer liable for paying WC benefits for his work injury because of J&S's uninsured status.

The Act recognizes certificates of insurance as "proof of insurance" **without limitations** beyond that the certificate must "demonstrat[e] current coverage and compliance with the requirements of th[e A]ct." 77 P.S. § 462.6. Holding that a third-party certificate holder **cannot** reasonably or justifiably rely upon a certificate of insurance that contains the statutorily required information and a certification by an insurer's authorized representative that such information is correct because it also includes a boilerplate disclaimer would effectively make that certificate worthless for its statutorily prescribed purpose of being proof of WC insurance. Brickstreet's position leaves third-party entities, like a municipality that grants a building permit

46

or a contractor who subcontracts work, that rely on the statutorily proscribed "proof of insurance" in an untenable position. Dish Network questions what more could it have done beyond requiring the Certificate as proof of J&S's WC coverage. We agree that Dish Network could not have done more because such document is what is expressly contemplated by the Act as proof of insurance, and, unlike Mr. Hiney, and J&S, Dish Network could not have known that J&S had not paid its renewal premium.[28] As between Dish Network and Brickstreet, whose agent misrepresented the status of J&S's WC coverage to Dish Network, "it is more reasonable for [Brickstreet as the] principal, who has placed the agent[, Mr. Hiney,] in the position of trust and confidence, to be the one to suffer from the wrongful act . . . , as opposed to an innocent stranger[, Dish Network]." *Travelers Cas.*, 772 A.2d at 460. Although Brickstreet argues it made no promises to Dish Network, the Certificate, naming Dish Network the certificate holder, was issued by Mr. Hiney using his authority as Brickstreet's agent and as Brickstreet's "Authorized Representative" certifying to Dish Network that J&S was covered by the Brickstreet WC policy identified therein. Thus, we are not persuaded by Brickstreet's arguments in this regard. Accordingly, we conclude the Board erred in affirming the WCJ's conclusion that Dish Network did not establish that Brickstreet is equitably estopped from denying the coverage represented within the Certificate such that Dish Network could be named Claimant's statutory employer. Thus, the Board's Order in this regard is reversed.

---

[28] This places Dish Network in a different position than J&S, which had also claimed Brickstreet was estopped from denying coverage.

47

### 3. What is Dish Network's Remedy

Dish Network argues that if the Court agrees with its equitable estoppel argument, the Court should remand its appeal for the Board to remand to the WCJ "to enter a Decision consistent with the Court's Order." (Dish Network's Reply Br. at 17.) It observes that it has already paid the indemnity and medical benefits awarded based on J&S's inability to pay those sums. (*Id.* at 12.) We agree a remand is appropriate under these circumstances.

As set forth above, the WC authorities have over "the general question of liability of an insured" and to "determine the liability of an insurer." *Felmont Oil Corp.*, 525 A.2d at 456. This situation is akin to a dispute between two insurers or employers over which is responsible for the payment of WC benefits. In such instances, where the non-paying party is found to be responsible, WC authorities have the ability to direct reimbursement to the paying party. *See* Section 410 of the Act, 77 P.S. § 751 (providing that when there is a dispute between two insurers or employers, one will be ordered to pay benefits and that after a WCJ or the Board "render[s] a final decision, the payments made by the . . . carrier not liable . . . shall be awarded or assess against the . . . carrier liable in the case . . . ."); *City of Williamsport v. Workmen's Comp. Appeal Bd.*, 423 A.2d 817 (Pa. Cmwlth. 1980) (reviewing case where one insurer was ordered by a referee[29] to pay WC benefits pursuant to Section 410 by interlocutory order but was later allowed to recover against the other insurer based on a finding that the second insurer was liable). It is also like a situation where a claimant's private insurer seeks to recover its payments via a subrogation lien from an employer's WC carrier, which may also be heard by WC authorities. *See Lusby v. Workers' Comp. Appeal Bd. (Fischler Co. & Sparmon,*

---

[29] WCJs were previously known as referees.

48

*Inc.)*, 976 A.2d 1230, 1235 (Pa. Cmwlth. 2009) (holding that a private insurer's subrogation lien must be sufficiently raised and established before a WCJ to be recoverable).  Accordingly, we remand the matter at Docket Number 928 C.D. 2023 with instructions to remand to the WCJ for additional proceedings consistent with the foregoing.

## IV.    CONCLUSION

Because we conclude the Board did not err or abuse its discretion in upholding the determination that Claimant was J&S's employee and not an independent contractor when he was injured, we affirm the Board's Order in that regard. However, because we conclude Dish Network established that "the facts [in this] case give rise to the application of the doctrine of equitable estoppel," which "is a question of law that can be addressed by . . . this Court on appeal," *Cozzone*, 41 A.3d at 109 n.5, and that the Board and WCJ erred in holding otherwise, we reverse the Board's Order in that regard, and we remand the matter at Docket Number 928 C.D. 2023 for further remand to the WCJ for additional proceedings.

_____

RENÉE COHN JUBELIRER, President Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

J&S Technology Solutions, Inc.,      :  CASES CONSOLIDATED
                       Petitioner   :
                                  :
             v.             :   No. 922 C.D. 2023
                                  :
Wilben Gonzalez, Dish Network,    :
LLC, Brickstreet Insurance Company, :
and Uninsured Employer Guaranty   :
Fund (Workers' Compensation      :
Appeal Board),                :
                Respondents   :

Dish Network, LLC,              :
                       Petitioner   :
                                  :
             v.             :   No. 928 C.D. 2023
                                  :
Wilben Gonzalez, J&S Technology   :
Solutions, Inc., Brickstreet Insurance :
Company, and Uninsured Employer  :
Guaranty Fund (Workers' Compensation :
Appeal Board),                :
                Respondents   :

## **O R D E R**

**NOW**, August 4, 2026, the Order of the Workers' Compensation Appeal Board (Board), entered in the above-captioned matter, is hereby **AFFIRMED IN PART** and **REVERSED IN PART**, and the matter at Docket Number 928 C.D. 2023 is **REMANDED** for the Board to further remand to the Workers' Compensation Judge for proceedings consistent with the foregoing opinion.

Jurisdiction relinquished.

_____
RENÉE COHN JUBELIRER, President Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| J&S Technology Solutions, Inc., | : | CASES CONSOLIDATED |
| Petitioner | : | |
| | : | |
| v. | : | |
| | : | |
| Wilben Gonzalez, Dish Network, | : | |
| LLC, Brickstreet Insurance Company, | : | |
| and Uninsured Employer Guaranty | : | |
| Fund (Workers' Compensation | : | |
| Appeal Board), | : | No. 922 C.D. 2023 |
| Respondents | : | |
| | | |
| Dish Network, LLC, | : | |
| Petitioner | : | |
| | : | |
| v. | : | |
| | : | |
| Wilben Gonzalez, J&S Technology | : | |
| Solutions, Inc., Brickstreet Insurance | : | |
| Company, and Uninsured Employer | : | |
| Guaranty Fund (Workers' | : | |
| Compensation Appeal Board), | : | No. 928 C.D. 2023 |
| Respondents | : | Argued: February 4, 2026 |

BEFORE:  HONORABLE RENÉE COHN JUBELIRER, President Judge
HONORABLE PATRICIA A. McCULLOUGH, Judge
HONORABLE ANNE E. COVEY, Judge
HONORABLE CHRISTINE FIZZANO CANNON, Judge
HONORABLE STACY WALLACE, Judge
HONORABLE MATTHEW S. WOLF, Judge
HONORABLE STELLA M. TSAI, Judge

DISSENTING OPINION
BY JUDGE FIZZANO CANNON                    FILED: August 4, 2026

The Majority concludes that the Workers' Compensation Appeal Board
(Board) did not err in affirming the determination of the Workers' Compensation
Judge (WCJ) that Wilben Gonzalez (Claimant) was an employee of J&S Technology

Solutions, Inc. (J&S) when he was injured on October 28, 2019. I would conclude that the WCJ erred, first, by determining Claimant's employment status as a matter of fact when it is a question of law, and second, by failing to evaluate the relevant documentary evidence of record and support his determination with record-based reasoning as the Workers' Compensation Act[1] requires. As such, I respectfully dissent.

The record includes an independent contractor agreement with a one-year term beginning on June 17, 2015, when it was signed by Claimant and J&S's president. C.R. at 851-59.[2] The agreement indicates that contractors "are responsible . . . to supply their own commercial liability, automobile and workers' compensation insurance" and for paying their own taxes. *Id*. at 852. In that respect, the record includes certificates of insurance for the commercial general liability (CGL) coverage Claimant maintained while associated with J&S in 2015 to 2016 and then from 2018 to 2020, inclusive of the date of injury. *Id*. at 1017-21. The coverage indicated in these certificates ranged from $5,000 for medical expenses, through $1,000,000 per occurrence, to $2,000,000 for "general aggregate" and "products-comp/op agg." *Id*.

The record also includes Claimant's W-9 tax form from 2015 with a checked box for "Individual/sole proprietor," as well as 1099 forms for 2016 through 2019. C.R. at 993 & 1012-15. Lastly, the record includes a payroll audit report proffered by Brickstreet, J&S's workers' compensation insurer. *Id*. at 1191-94. The report, which was prepared by J&S for Brickstreet, covers September 2018 through

---

[1] Act of June 2, 2015, P.L. 736, as amended, 77 P.S. §§ 1-1041.4, 2501-2710.

[2] Certified Record references are to electronic pagination.

CFC - 2

September 2019, just before the date of injury. *Id.* at 511. The report lists J&S's employees and their gross earnings and deductions for state and federal tax purposes. *Id.* Claimant is not among the 12 employees listed in the report. *Id.*

> The WCJ found as fact that:
>
> An Independent Contractor Agreement ("IC Agreement") Claimant signed upon his hiring expired in June 2016. He was never presented with another IC Agreement to sign.
>
> [Claimant] was paid per job. J&S issued him a 1099.
>
> On [the date of injury], [Claimant] owned a liability insurance policy.

*See* C.R. at 92-94.

Then, in Finding of Fact 25, the WCJ stated: "This Judge finds that on [the date of injury], Claimant was an employee of [J&S]." C.R. at 106. In his Conclusions of Law, the WCJ did not supplement this finding of employee status with reasoning or analysis of the evidence, including the documentary evidence, other than to state that Claimant met his burden of proving that on the date of injury, he sustained disabling injuries "during the course of his employment with [J&S]." *Id.* at 107. The independent contractor agreement, tax documents, certificates of Claimant's CGL insurance, and payroll audit report were admitted as exhibits, but the WCJ's decision did not address how this evidence affected or contributed to his finding that Claimant was J&S's employee.

On appeal, J&S argued to the Board that the WCJ "failed to provide any reasoned analysis at all" for the finding that Claimant was a J&S employee, which is "inconsistent with Section 422(a) of the Act requiring a reasoned decision."

C.R. at 123-25.[3]  The Board acknowledged the existence of the initial independent contractor agreement, the W-9 form Claimant completed asserting sole proprietor status, and the 1099 tax documents for each year that Claimant was with J&S.  *Id*. at 138-40 & 143.  In a footnote, the Board mentioned the payroll audit report, where J&S listed its employees, not including Claimant; the Board noted that Brickstreet had offered the report as evidence against Claimant's claims of employee status.  *Id*. at 143 n.7.  After the foregoing summary of the documentary evidence as well as the parties' testimony, the Board stated that the determination of employment status is a question of law and characterized J&S's argument on appeal as asserting that Claimant was not an employee because he was, *inter alia*, "paid by the job with no deductions for taxes" and "was required to provide proof of liability insurance." C.R. at 145-46.  The Board first rejected J&S's argument that the initial independent contractor agreement continued to define the employment relationship through the date of injury.  *Id*. at 146.  The Board next examined the evidence of Claimant's day-to-day duties, such as Claimant's need for specific instructions on performing Dish installations and J&S's handling of appointment assignments.  *Id*.  Consequently, the Board concluded that J&S "exercised significant control over the work to be done. *Id*.

The Board noted the WCJ's determinations that Claimant's testimony was credible and that the testimonies of J&S's witnesses were largely not credible and stated that the WCJ **"found, without explanation, that Claimant was an employee of J&S on the date of injury."**  C.R. at 144 (emphasis added).  Despite the WCJ's failure to evaluate the documentary evidence summarized in the WCJ's

---

[3] J&S similarly argues in its brief to this Court, along with Dish Network, LLC (Dish), that both administrative tribunals failed to address and evaluate the relevant documentary evidence. *See* J&S's Br. at 19, 21-22; J&S's Supplemental Br. at 4-5, 9-11; Dish's Supplemental Br. at 3-4.

Findings of Fact, the Board upheld the WCJ's determination, focusing primarily on Claimant's daily activities. *Id*. at 146. Other than rejecting J&S's argument that the terms of the initial independent contractor agreement "continued to define the relationship" between Claimant and J&S through the date of injury, the Board ignored the documentary evidence pertaining to Claimant's status as either an employee or a contractor. *Id*. This evidence included the payment and tax documentation, Claimant's CGL insurance documentation, and the payroll audit report of J&S employees that did not include Claimant.

"[T]he question of whether a claimant is an employee or an independent contractor is one of law, reviewable by the Board and this Court. This review, however, is to be based upon the findings of fact," which are the province of the WCJ. *Scher v. Workers' Comp. Appeal Bd. (City of Phila.)*, 740 A.2d 741, 746 (Pa. Cmwlth. 1999) (citation omitted). To the extent an appeal in this context "presents questions of law, review in this matter is plenary." *Am. Road Lines v. Workers' Comp. Appeal Bd. (Royal)*, 39 A.3d 603, 610 n.6 (Pa. Cmwlth. 2012). However, this does not mean that we may bypass or usurp the WCJ's primary factfinding role as "the sole arbiter of the credibility and the weight of testimony and other evidence." *Scher*, 740 A.2d at 746.

> Employment status entails the following principles:
>
> Control of manner [in which] work is to be done; responsibility for result only; terms of agreement between the parties; the nature of the work or occupation; skill required for performance; whether one is engaged in a distinct occupation or business; which party supplied the tools; whether payment is by the time or by the job; whether work is part of the regular business of the employer, and also the right to terminate the employment at any time.

> Whether some or all of these factors exist in any given situation is not controlling. Further, while each factor is relevant, there are certain guidelines that have been elevated to be dominant considerations. . . . [C]ontrol over the work to be completed and the manner in which it is to be performed are the primary factors in determining employee status. Moreover, it is the existence of the right to control that is significant, irrespective of whether the control is actually exercised.
>
> Additional factors may include the putative employer's withholding of wages for income taxes, acquisition of (or failure to acquire) workers' compensation insurance, and the existence of a signed contractor agreement. With regard to such agreements, caution is warranted in light of the potential for employers to use them as a means of avoiding legitimate workers' compensation liability.

*IDI Logistics, Inc. v. Clayton (Workers' Comp. Appeal Bd.)*, 284 A.3d 248, 255-56 (Pa. Cmwlth 2022) (citing, *inter alia*, *Universal Am-Can, Ltd. v. Workers' Comp. Appeal Bd. (Minteer)*, 762 A.2d 328, 330 (Pa. 2000)).

Thus, the question of employment status requires consideration of the unique facts of each case. While the right to control the work is the primary consideration, this does not mean that other factors that may be present in a given case, such as documentary evidence suggesting contractor status, are not relevant or can be ignored. *See Edwards v. Workers' Comp. Appeal Bd. (Epicure Home Care, Inc.)*, 134 A.3d 1156, 1163 (Pa. Cmwlth. 2016) (stating that "the existence of an employment or independent contractor agreement is another factor to consider" and that a tax filing denoting self-employment is "a relevant factor"). Moreover, Section 422(a) of the Workers' Compensation Act states: "When faced with conflicting evidence, the [WCJ] must adequately explain the reasons for rejecting or discrediting competent evidence." 77 P.S. § 834. "Uncontroverted evidence may not be rejected for no reason or for an irrational reason; the [WCJ] must identify that evidence and

explain adequately the reasons for its rejection.  The adjudication shall provide the basis for meaningful appellate review." *Id.*

In this case, the documentary evidence concerning Claimant's employment status was highly pertinent to the question of his employment status. The WCJ erred by failing to incorporate and analyze that evidence.  The WCJ also failed by treating the question as one of fact when it is a question of law, albeit based on the facts as found by the WCJ.  *Scher*, 740 A.2d at 746.

## I. Claimant's Maintenance of CGL Insurance

Our case law has not previously considered how a workers' compensation claimant's maintenance of CGL insurance is to be considered in determining whether the claimant is an employee or an independent contractor. However, the issue has arisen in two parallel contexts.  The Construction Workplace Misclassification Act[4] (CWMA), often considered as part of a workers' compensation inquiry when injuries occur in the construction field, provides a number of statutory criteria for determining whether an individual will be classified as an independent contractor.  *See* 43 P.S. § 933.3(b).  One of the CWMA's criteria is whether the individual "maintains liability insurance during the term of this contract of at least $50,000."  43 P.S. § 933.3(b)(6).  Indeed, in *Hawbaker v. Workers' Compensation Appeal Board (Kriner's Quality Roofing Services)*, 159 A.3d 61 (Pa. Cmwlth. 2017), a CWMA case, this Court concluded that the claimant was an independent contractor in part because the record included his CGL application, which "identified his business as 'Justin L. Hawbaker I' and himself as 'owner.'" *Id.* at 71.

---

[4] Act of October 13, 2010, P.L. 506, 43 P.S. §§ 933.1–933.17.

Unemployment compensation law also considers the nature of employment relationships. In that respect, our cases have expressly held that maintenance of liability insurance reflects self-employed or independent contractor status. *See Hope v. Unemployment Comp. Bd. of Rev.*, 308 A.3d 944, 952 (Pa. Cmwlth. 2024) (tax preparer); *Pathways Counseling Servs., LLC v. Dep't of Lab. & Indus.*, 214 A.3d 328, 334 (Pa. Cmwlth. 2019) (psychological counselors).

Moreover, CGL insurance entails relationships beyond those of the individual claimant and putative employer, particularly with third parties who may have claims involving the coverage. When an employment relationship exists, the doctrine of *respondeat superior* applies and "recovery is sought on the basis of vicarious liability. An employer is vicariously liable for the wrongful acts of an employee if that act was committed during the course of and within the scope of employment." *Brezenski v. World Truck Transfer, Inc.*, 755 A.2d 36, 39 (Pa. Super. 2000). However, as a general rule, "the employer of an independent contractor is not liable for physical harm caused to another by an act or omission of the contractor or his servants." *Thomas v. City of Phila.*, 668 A.2d 292, 295 (Pa. Cmwlth. 1995). In that regard, "[l]iability policies are commonly issued to *contractors* insuring them against liability for damages or injuries occurring in connection with the performance of their contracts." *Hammermill Paper Co. v. Rust Eng'g Co.*, 243 A.2d 389, 394 (Pa. 1968) (quoting Couch on Insurance, 2d, 44; 338 (Vol. 11)) (emphasis added).

In addition to a distinct relationship with potential third-party plaintiffs, a CGL insured also maintains a third-party relationship with his insurer that is outside of his relationship with the putative employer. In order to obtain CGL insurance, the applicant generally must aver that he or she is doing so as a business

entity, such as a sole proprietorship. *See Hawbaker*, 159 A.3d at 64 (noting that the claimant "acknowledged that his application for liability insurance identified his business name as 'Justin L. Hawbaker, I' and provided a business address"). These characteristics of CGL insurance, where the insured secures coverage of the services he performs because he is not an employee of a company that will provide such coverage on his behalf, distinguish it from traditional employment status.

The Majority concludes that the documentary evidence of Claimant's CGL coverage is "not persuasive in light of the other evidence that supports the finding of employment." Majority Slip Op. at 23-24. However, the WCJ did not evaluate this evidence at all beyond including its existence in the above-quoted summary of Claimant's testimony. There is no dispute that Claimant maintained this coverage, but the WCJ's failure to weigh it cannot be cured by the Majority improperly usurping the WCJ's role and doing so itself. *See Scher*, 740 A.2d at 746 (stating that "the question of whether a claimant is an employee or an independent contractor is one of law, reviewable by the Board and this Court. This review, however, is to be based upon the findings of fact," which are the province of the WCJ).

Whether the WCJ intentionally ignored the documentary CGL evidence or simply failed to include it in his discussion, it was germane to the question of Claimant's employment status. Although such evidence must be viewed with reasonable caution in light of the possibility that putative employers may use it to avoid the legal protections owed to employees, it is nevertheless pertinent and must be considered and evaluated as long as it is not obviously pretextual. *See IDI Logistics*, 284 A.3d at 255-56; *Edwards*, 134 A.3d at 1163. Moreover, as noted, the employment inquiry is a question of law and it is the WCJ's duty to explain the

reasoning when competent evidence is rejected. 77 P.S. § 834; *Scher*, 740 A.2d at 746.

Here, although the WCJ did not credit the bulk of the testimony given by J&S's witnesses, Claimant's testimony was fully credited, including that he obtained his own CGL insurance before he started performing installations for J&S and maintained it after he began with J&S. C.R. at 252-54. There is no dispute that the initial independent contractor agreement with J&S *required* Claimant to maintain his own CGL and workers' compensation coverage for the services he performed. *Id*. at 852. Then, in 2018 through 2019, before the date of injury, Claimant acknowledged that J&S expressly *required* him to provide certificates of his CGL insurance and that he did so. *Id*. at 253. As noted, the certificates for Claimant's CGL insurance, including on the date of injury, are of record. *Id*. at 1017-21.

As noted, it is undisputed and relevant to Claimant's employment status that he maintained and paid for his own CGL coverage, both before and throughout the course of his relationship with J&S. This suggests that he did not rely on J&S to insure his installation services through vicarious liability. Rather, he held himself out as insuring his own services to his CGL insurer, to J&S, and, at least tacitly, to customers.

Moreover, the evidence of Claimant's ongoing CGL coverage cannot be viewed as pretextual on J&S's part because J&S did not prepare the CGL policies or certificates that Claimant maintained during the relevant time period. The WCJ should have engaged with this evidence but did not. Instead, and in violation of the Act's requirement that a WCJ must adequately explain their reasons for rejecting competent evidence, the WCJ ignored this evidence and simply deemed Claimant an employee of J&S as a finding of fact without providing any reasoning or support

from the record.  This was legal error that, as noted, the Majority cannot cure by weighing the evidence itself.  *See* 77 P.S. § 834; *Scher*, 740 A.2d at 746.

## II.  List of Employees Provided by J&S to its Workers' Compensation Insurer

Similarly to CGL insurance, this Court has not yet directly analyzed the impact on the employment status inquiry of an employee payroll report provided by an employer to its workers' compensation insurer as part of audits by the insurer to determine appropriate premiums.  However, in *American Insurance Company v. Workers' Compensation Appeal Board (Barnhart)*, 606 A.2d 655 (Pa. Cmwlth. 1992), which was primarily a dispute over which entity would be considered the liable employer because other facts supported the injured truck driver's employment status, this Court noted that the audit report produced in that case "specifically named the [c]laimant as a payroll employee" of one of the putative employers.  *Id*. at 614.

Here, J&S's payroll audit list of employees identifies 12 individuals whom J&S held out to its workers' compensation insurer as its employees between September 2018 and September 2019, just before Claimant's October 2019 injury; Claimant's name is not on that list.  C.R. at 1191-94.  Four individuals included in the audit list, including J&S's principal, are listed as being salaried.  *Id*.  The remaining eight individuals appear to have been paid hourly rates ranging from $8 to $12.50 plus overtime.  *Id*.  All entries on the audit list note deductions for local, state, and federal taxes, as well as further deductions for unemployment, Medicare, and other purposes.  *Id*.

Although the WCJ did not credit testimony by J&S's witnesses concerning the company's use of both employees and independent contractors as

installers, the audit list speaks for itself and indicates, at a minimum, that J&S held itself out to its workers' compensation insurer as having 12 employees. See C.R. at 1191-94. Again, Claimant was not included as an employee on the audit list. Further, it is undisputed that Claimant was paid by the job rather than by the hour and the documentation in the record relating to his earnings does not indicate any deductions from J&S's payments to him. *Id*. at 250 & 997-1007. However, despite the audit list's relevance to Claimant's employment status, the WCJ did not mention or evaluate it at all. Likewise, the Board, despite mentioning the existence of the audit list, did not evaluate it. *See id*. at 143 n.7.

The Majority fails to discuss the audit list, but comments on the testimonial evidence of J&S's witnesses that the company used both employees and independent contractors as installers. Majority Slip Op. at 24-25 (stating that "[t]he fact that J&S uses both employees and independent contractors . . . raises questions about the misclassification of the independent contractors"). First, the testimony that the Majority relies on for this point, while undisputed, was not among the limited aspects of the J&S witnesses' testimony that the WCJ found credible. C.R. at 104-05. In fact, the WCJ "explicitly rejected" all testimony by those witnesses other than the enumerated portions that were credited. *Id*. As such, that testimony cannot be treated as facts found by the WCJ upon which this Court may base a legal conclusion concerning Claimant's employment status. *See Scher*, 740 A.2d at 746 (stating that "the question of whether a claimant is an employee or an independent contractor is one of law, reviewable by the Board and this Court. This review, however, is to be based upon the findings of fact" and that neither the Board nor this Court may reweigh the evidence). In so doing here, the Majority compounds the WCJ's error

in failing to evaluate and address the relevant evidence in this case and the Board's error in recognizing the WCJ's error but failing to correct it.

Moreover, the mere fact that a company uses both employees and independent contractors to perform its services does not necessarily cast doubt, without evidence, on the status of an individual as either an employee or an independent contractor. In this case, at a minimum, the fact that Claimant is not included on J&S's payroll audit list of employees relates to the legal determination of Claimant's employment status. Therefore, the WCJ erred by failing to address it.

### III. The Other Documentary Evidence Generally

In addition to Claimant's CGL insurance and the payroll audit list, the record includes Claimant's W-9 tax form indicating his identification as "Individual/sole proprietor" and his 1099 forms for each year he was with J&S. C.R. at 993. It also includes the initial independent contractor agreement, which is detailed, specific, and does not bear any characteristics suggesting that it is pretextual. *Id*. at 1191-94. This documentary evidence, all of which was properly admitted, speaks for itself; none depends on the portions of J&S's witnesses' testimony that the WCJ did not find credible.

As previously noted, although this type of evidence should be considered with reasonable caution in light of the possibility that putative employers may use it to avoid the legal obligations owed to employees, it is relevant to an employee status inquiry when it appears in a claim litigation record and should not be ignored when the analysis is conducted. *See IDI Logistics*, 284 A.3d at 255-56; *Edwards*, 134 A.3d at 1163.

A review of the law and the record here indicates that the documentary evidence was relevant and, at the least, should not have been ignored by the WCJ in determining Claimant's employment status, which should have been treated as a conclusion of law requiring an explanation of reasoning, and not as a finding of fact. *See* 77 P.S. § 834; *Scher*, 740 A.2d at 746. The WCJ's summary of Claimant's testimony, which the WCJ found fully credible, mentioned the initial independent contractor agreement, Claimant's 1099 tax status, and his maintenance of CGL insurance. C.R. at 92-94 & 104. Following this summation, the WCJ then committed what I view as several interconnected legal errors. First, the WCJ stated in Finding of Fact 25 that Claimant was an employee of J&S. *Id*. at 106. The law is clear that although this inquiry is based on the WCJ's findings of fact, an employment determination is ultimately a question of law fully reviewable by this Court. *Scher*, 740 A.2d at 746. The WCJ's inclusion of this legal determination in the findings of fact may have been an oversight, but the WCJ failed to supplement or correct the error by analyzing, or even mentioning, the relevant documentary evidence in his Conclusions of Law, which stated, without any analysis or reference to the record, that Claimant met his burden to show that he sustained a disabling injury "in the course of his employment" with J&S. C.R. at 107.

As noted above, Section 422(a) of the Act requires a WCJ to adequately explain the rejection of competent evidence, whether conflicting or uncontroverted. *See* 77 P.S. § 834. Here, the WCJ noted the existence of the various pieces of relevant documentary evidence while summarizing Claimant's testimony in the findings of fact, but failed to fulfill his duty to evaluate that evidence in any qualitative manner, much less explain why it was rejected. *See* C.R. at 92-94 & 104-08. The Board, in its appellate capacity, may review WCJ determinations for

substantial evidence and legal errors in the same manner as this Court. *See Twyman v. Workers' Comp. Appeal Bd. (Dep't of Transp.)*, 720 A.2d 780, 785 (Pa. Cmwlth. 1998). Here, the Board noted the WCJ's failure to explain the basis for concluding that Claimant was an employee. C.R. at 144. However, the Board then duplicated the WCJ's error by focusing solely on the WCJ's credibility determinations and ignoring the relevant documentary evidence concerning Claimant's employment status. *Id*. at 144-46.

The documentary evidence of record here, including the initial independent contractor agreement, tax documentation, CGL insurance, and audit list, is highly relevant to the threshold question of Claimant's employment status. Yet, as discussed above, in the case of Claimant's CGL coverage, the Majority improperly weighs the evidence itself. Majority slip op. at 23-24. In the case of the audit report, the Majority, like the WCJ, ignores it altogether while relying on testimony that the WCJ expressly discredited. *Id*. at 24-25.

While reasonable caution is warranted where documentary evidence concerning employment status is at issue, the Majority effectively condones the WCJ's utter disregard of this evidence, whether purposeful or not, which the Board did not correct by returning the case to the WCJ for a revised decision that properly addressed the evidence of record. *See State Workers' Ins. Fund v. Workers' Comp. Appeal Bd. (Lombardi)*, 845 A.2d 987, 990 (Pa. Cmwlth. 2004) (remanding to the Board to remand to the WCJ for "further findings of fact and conclusions of law" upon concluding that "[b]ecause the WCJ made no findings of fact in this regard, we cannot properly review the nature of [the claimant's] relationship with [the putative employer]" under specific section of the Act concerning real estate agents). In so

doing, the Majority excuses the failures of the administrative tribunals in this case. In light of the foregoing concerns, I respectfully dissent.

_____
CHRISTINE FIZZANO CANNON, Judge